**RIXON ELECTRONICS, INC., and Rixon Liquidating Corp.**

v.

**The UNITED STATES.**

**No. 475–73.**

United States Court of Claims.

June 16, 1976.

Stephen B. Clarkson, Washington, D. C., for plaintiff. Henry G. Beauregard, Washington, D. C., attorney of record. Thomas J. Touhey and Sullivan, Beauregard & Clarkson, Washington, D. C., of counsel.

Marc J. Fink, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before NICHOLS, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This case is before us on defendant's request for review of a recommended decision of Trial Judge David Schwartz, which he submitted in accordance with Rule 166(c). The case is a contract dispute governed by the Wunderlich Act, 41 U.S.C. Secs. 321, 322. A decision of the Armed Services Board of Contract Appeals (ASBCA), 72–1 BCA ¶ 9323, denied the claim. Trial Judge Schwartz would have us reverse this decision and grant summary judgment to the plaintiff, with remand to the ASBCA for quantum. Though we are greatly aided by his able analysis, we reach the opposite result after careful consideration of the record, briefs and oral arguments of counsel. We conclude that the ASBCA, despite some errors of law, arrived at the right result. Therefore its decision is affirmed, and the petition is dismissed.

Plaintiff, Rixon Electronics, Inc. (here joined by its liquidating successor), was awarded a Navy contract for the manufacture of 153 low-frequency radio transmitters for shipboard use. Under circumstances of great difficulty and stress, it performed the contract. The claim demands an equitable adjustment as provided in the "Government Furnished Property" and "Changes" articles, and, in the second and third counts, reformation of a certain release, to be discussed presently. Certain microfilms, Government furnished, were relied on in preparation of plaintiff's bid, plaintiff says, and for obtaining inter-changeability of components with those procured under prior awards. They were not, says plaintiff, "received by the contractor in a condition suitable for the intended use," in the language of the "Government Furnished Property" clause, thus generating a duty in the Contracting Officer to make an equitable adjustment. It seems to be agreed by all concerned that they were grossly defective, to the plaintiff's considerable detriment. The ASBCA, however, denied any such adjustment because, it held, the plaintiff released its claim by Modification No. 2, executed at a time when the subject matter of the claim was in existence and the costs or losses attributable to the deficiency had been incurred. The release reads as follows:

> The Contractor further agrees that in consideration of the above modification, the Contractor for itself, its successors and assigns here remises, releases, and forever discharges the Government, its officers, agents, and employees of and from all liabilities, obligations, claims and demands whatsoever arising under or in any manner connected with this contract, the subject matter of which was in existence on or prior to the date of this modification (whether or not asserted by or known to the Contractor and whether costs, losses, and expenses attributable thereto were incurred prior to or after the date of this modification), excepting only claims for payments of amounts due and payable to the Contractor under the terms of this contract.

It is agreed by all that this release, if enforced according to its terms, bars the instant claim. The reasons alleged for not enforcing it are two: first, it was signed under "economic duress", second, it should be "reformed" as signed under "mutual mistake" not reflecting the true agreement of the parties. We deal with these two points in order.

There is much law on the nature of the "economic duress" that will invalidate a government contractor's signed release of liability under a Government contract, or for breach of it. We will assume for

present purposes that the trial judge stated correctly that it must be a case where:

1. * * * the Government is responsible for the contractor's financial necessity, in the sense of having brought it about by wrongful or improper conduct, * * *

that is, wrong by the Government must have caused the contractor's distress. Next:

2. * * * the involuntary nature of the victim's assent, given without reasonable alternative, usually to avoid irreparable damage and a coercive or wrongful act by the other party.

That is, the Government must have exploited the distress it had itself created, to obtain an unjustified release of a good and valid claim. *Urban Plumbing & Heating Co. v. United States,* 408 F.2d 382, 389–92, 187 Ct.Cl. 15, 28–33 (1969), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970); *Fruhauf Southwest Garment Co. v. United States,* 111 F.Supp. 945, 951–52, 126 Ct.Cl. 51, 61–63 (1953). Some wrongful conduct must be shown to shift to defendant the responsibility for bargains made by plaintiff under the stress of financial necessity. The mere stress of business conditions will not support duress contentions when the Government is not responsible for the underlying circumstances. *Fidelity & Casualty Co. v. United States,* 490 F.2d 960, 966, 203 Ct.Cl. 486, 497 (1974); *La Crosse Garment Mfg. Co. v. United States,* 432 F.2d 1377, 1382–83, 193 Ct.Cl. 168, 177 (1970). *See* 13 *Williston On Contracts,* Secs. 1601–03, 1624 (3d ed. 1970); J. Dalzell, *Duress by Economic Pressure,* 20 N.C.L.Rev. 237, 341 (1942).

Let us weigh the trial judge's conclusions by the above criteria, calling them tests 1. and 2.

As to 1. this case is remarkable among Wunderlich cases, in the extraordinary language used by the Government to warn how risky the deal was, that it was offering. A cynic might say the Government was happy with its previous sole source procurement of the item and did not want to deal with anyone else. Never have the small craft warning pennants been larger, redder, or more numerous! It may well be that the Government should pay small contractors the cost of their efforts in performing unusually difficult tasks, for which they are unqualified, regardless of what self-exculpatory language the Government writes into its proposals. But we can neither legislate such an end, nor reach the same result by ignoring the self-exculpatory language and making for the parties a contract other than the one they signed.

The language in the Government proposals, with the inherent difficulty of the task, must be credited with deterring anyone from bidding on the IFB, except the previous sole source and the plaintiff. The former, Westinghouse, bid $17,758.52 per unit to plaintiff's $11,888.45, or $870,550.11 higher for the 153 units to be supplied.

The Government IFB recited that the Radio Transmitting Set called for was a: * * * highly specialized, complex radio communication device having extreme accuracy, reliability, stability and long life under the rugged environmental conditions encountered in Navy shipboard service, such as heat, humidity, shock and vibration. They are high quality articles the production of which requires a high order of workmanship and quality controls as well as careful selection of quality parts. To date only one concern has previously produced substantially the same articles as called for herein and had them approved and accepted by the Navy.

The IFB then spelled out that the required delivery schedule was much shorter than in the previous procurement and that delivery times were of paramount importance: * * * This Schedule is considered to be extremely tight for firms, even ones highly qualified for the work, who have not previously produced substantially similar articles and had them approved or accepted by the Navy. * * *

The IFB then warns that the time schedule requires that it would be necessary to order parts and materials and commence produc-

tion before Government approval of the pre-production equipment and:

> * * * the successful bidder must assume all risks associated with production equipment and supplies in advance of notice of approval * * * The bidder represents that he understands the existence and nature of such risks and that he has taken them into consideration in formulating his bid.

Unless the successful bidder were the previous sole source, under these threats he would naturally hope for full cooperation by the Government in supplying information as to exactly what was to be produced. Though facially specifications were "essentially of the performance type," it did not suffice that the sets should work: by the contract they had to be interchangeable part by part with a set previously procured. However, the Government also gave assurance that its information as to previously procured sets would be entirely undependable. Microfilms of parts would be available for examination before bidding, and would be furnished to the successful bidder. But they were accepted under previous contracts whose specifications:

> * * * may not be identical to the requirements of this contract [!]

They were provided only for:

> * * * such information and assistance as they may provide the Contractor with respect to the general nature of the equipments and repair parts to be delivered under this contract. * * *

As will appear, a clause used in other contracts, that the microfilms would also be useful in obtaining interchangeability, was conspicuously missing here. In addition, a model set of the type to be procured was to be furnished, and this was to be used in meeting interchangeability requirements, but incredible as it may seem, the Government did not:

> * * * represent that the * * * Set meets the requirements of this contract in every respect * * *

It might have been, and in fact was, obtained under a prior contract with different specifications. The Government also, if repetitiously, warned it did not:

> * * * represent that the Microfilm of Manufacturing Drawings is complete or legible in whole or in any particular part or that the drawings from which the microfilm was made are complete and accurate and free from omissions, errors, inconsistencies or other defects and it does not represent that the equipments or repair parts made in accordance with the Government Furnished AN/WRT-1 Radio Transmitting Set and/or Technical Manual and/or Microfilm of Manufacturing Drawings will meet the performance or other requirements of this contract including the specifications referenced directly or indirectly herein.

A bidder who had not previously manufactured a set was required to manufacture and test at its own expense a preproduction prototype.

It might seem incredible that the Government should demand interchangeability and not inform with any accuracy, interchangeable with what? How was the bidder, if not the previous sole source, supposed to know what it was to make? Apparently, as this bidder did it, by taking apart the Government furnished model and "engineering backwards" or in other words making what used to be known as "Chinese copies" of all parts not superseded in the new specifications. As to newly designed parts, that was a little harder, as the ASBCA found.

■ The trial judge disputes the finding of the ASBCA that the contractor did not look at the microfilms, as it was offered an opportunity to do before bidding. He infers that it looked, and was misled by what it saw, as to the material to be produced. It appears that this is irrelevant, for the contractor knew or should have anticipated from the IFB itself that the microfilms would be deficient. Moreover, whether or not it actually looked, it is bound by what it would have seen if it had looked. The ASBCA has found:

> * * * Moreover, appellant has not shown that if it had examined the micro-

film and model made available by the Government before the award at least some of the difficulty encountered reasonably could not have been recognized, anticipated and reflected in its prototype cost estimates. Thus, the general quality of the microfilm, its disorganization, the revisions of the specification under which the microfilm and model were produced, the absence of drawings for the mounting and power supply, and the absence of the MCW modification from both the drawings and model should have been reasonably apparent. The latter intelligence could also have been surmised from the fact that the MCW modification, which which was the largest source of appellant's engineering difficulty, was a new requirement encompossing design effort.

\* \* \*

It is clear from this the contractor should have realized it was undertaking original design effort, not just the copying of clearly delineated prototype parts.

The trial judge quotes other ASBCA statements, in a somewhat selective manner, as defendant points out in its brief. He does not quote the above telling passage. We do not perceive any mystery as to what the ASBCA meant to find, nor can it reasonably be held to lack support in substantial evidence. Everything the plaintiff says as to the defects in these microfilms tends to show more plainly that such defects could not have been entirely overlooked on the preliminary examination. The ASBCA does seem to think that the full enormity of the microfilm defects could only have been realized by one who tried to work with them. Plaintiff bid its bid, however, though it knew or should have known that the microfilms were to some extent defective, constituting a hazard of unknown proportions to the successful and profitable performance of the contract.

The ASBCA and the trial judge, who differ in so much else, join in asserting that the disclaimers here involved are not much different from those in *Thompson Ramo Wooldridge Inc. v. United States,* 361 F.2d 222, 175 Ct.Cl. 527 (1966). This is manifest-

ly incorrect. That case involved a claim for equitable adjustment, or alternatively, for breach of contract, by a contractor for radio transmission equipment who went through an experience much like the plaintiff's here, but signed no relevant release. There were equally bad, or worse microfilms, the same Government furnished property clause, with the same provision for equitable adjustment in case such property was not suitable for its intended use, and the same disclaimers of fitness expressly addressed to the microfilms. But there was an expressed statement that the microfilm would be of assistance in meeting the interchangeability requirement. This was essential to the plaintiff's case because it showed what the "intended use" was for which the warranty was given. The court said, 361 F.2d at 235, 175 Ct.Cl. at 547:

Had the Government intended the microfilm only to be "usable and useful [in some way] in obtaining interchangeability", as the Board ruled, it should have stated only the first of the two uses prescribed for the microfilm, i. e., that the film was furnished "for such information and assistance as \* \* \* [it] may provide." The provisional nature of this obligation probably would have saved the Government even for furnishing microfilm of dubious utility (as it did supply). But the Government went further and represented that the microfilm would be suitable for use in producing interchangeable parts and components. To us that necessarily means, in this manufacturing contract, that the making of prints was an "intended use" for which the film was furnished. \* \* \*

■ Here we have the case supposed in dictum in the above passage, where no statement is made in the contract that the microfilm is usable for interchangeability. It is asserted there, however, that the model transmitter is useful for that purpose. The conclusion follows that the disclaimers as to the microfilm, with nothing to contradict them, are effective to state their plain and obvious meaning. In *Thompson Ramo Wooldridge,* the court felt obliged to suppose that the disclaimer disclaimed utility

for "particular" purposes only, leaving not disclaimed that the microfilms would have value for some general purposes in connection with interchangeability. This somewhat sophistical interpretation is not required when there are no apparently contradictory clauses to construe. It is therefore, doubtful to say the least that in the absence of a release *Thompson Ramo Wooldridge* would have been any kind of authority here to sustain a claim by Rixon for an equitable adjustment, and still less a breach.

Bidders were also warned that there would be no progress payments until the prototype transmitter was approved, and when it was its cost recoverable by progress payment was limited to $100,000.

The ASBCA found (with support of substantial evidence) that the Navy calculated, on opening plaintiff's bid, that plaintiff would lose approximately $500,000. On the basis of the bid price disparity and the complicated nature of the items to be produced, the procurement officials requested plaintiff to review carefully and verify its cost estimates. It was told that a substantial loss appeared likely, which it would be forced to absorb. The ASBCA found the record unclear, however, as to whether any specific loss figure was mentioned. After checking its cost estimates, plaintiff confirmed its bid price, and the award was made on February 15, 1963.

In *Highway Products Inc. v. United States,* 530 F.2d 911, 208 Ct.Cl. —— (1976), plaintiff reconfirmed its bid after being warned it was inadequate, and this was held "an unreasonable assumption of risk". Plaintiff here would distinguish the case in that here the warning was broad and general, while there the procurement officials directed attention to specific components, whose cost and complexity plaintiff had underestimated. There is nothing to show here, however, that Government had more information with which to pinpoint the errors in the bid. The ASBCA found it did not. Plaintiff's charge that it had "superior knowledge" is unwarranted. Such a warning as was given here ought to be enough,

and should have been taken seriously. If it is held to be a nullity, future contracting officers will refrain from a courtesy that fairness and decency require.

Six weeks after the award, plaintiff took a step that speaks for itself. It hired a new project engineer (later project manager) with a promised bonus above his salary, of 1% of the contract price if plaintiff made a profit on the contract, *or broke even.* By this date the microfilms had been received and their defects realized, but the new project engineer satisfied himself that the bid "was realistic."

As regards the alleged wrong by the Government that sets up the contractor to be victimized by a coerced release, the invitation to an inexperienced contractor to entangle itself in this briar bush may be deemed morally reprehensible. But it cannot and is not denied that the law allows the Government to do it, if it disclaims any warranty by clear and unambiguous language. Any more effort to deter this contractor from its losing deal would probably have generated accusations that they were trying to preserve the sole source's monopoly. So the question boils down to this: is the disclaimer clear enough, alone or as aided by the warning to check the bid? You can engage a contractor to make snowmen in August, if you spell it out clearly, you are not warranting there will be any subfreezing weather in that month. But if you say you don't represent the microfilms are complete or legible in whole or in any particular part, and that the bid will generate a loss, and the bidder doesn't, apparently, believe you, what more can you say, legitimately, that will be more persuasive? Will you, with reason, conclude that the bidder wants to lose money, or at least, wants to break into this market so badly that loss of money is accepted as a minor consideration?

There is no charge the Government purposely furnished defective microfilm for some sinister object of its own. For all that appears, it did the best it could. It seems a fair inference that the previous sole source alone had the needed know-how. If there is

no discrepancy between what defendant furnished and what it warranted it would furnish, the claim that it did wrong is not sustained legally.

The ASBCA further found that shortly after the award, in March 1963, plaintiff's bank reduced its line of credit from $500,-000 to $300,000. The Board speculates this may have resulted from credit problems not attributable to the contract, as it is unexplained. It started a plague of financial difficulties that grew worse and worse until finally in December, plaintiff signed the sweeping release here at issue, to get only $50,000 added to its allowable progress payments.

It appears that the main reason for the plaintiff's then parlous economic conditions was its pig-headed resolve to take the contract despite provisions in the invitation amply sufficient to alert it, and despite express warnings that it was going to lose money. The alleged wrong by the Government was either non-existent, or at most a secondary cause. This is what the Board found, it appears with support of substantial evidence. To the extent the drawings were more incomplete and in worse condition than plaintiff might have reasonably expected, the Board assumed its extra costs resulting would have been reimbursable, citing *Thompson Ramo Wooldridge,* erroneously treating the disclaimer provision as substantially the same. Thus it assumes that but for the release, a claim for an equitable adjustment under the Government Furnished Property Clause would have been pursuable. But it does not treat the Government wrong as sufficient to invalidate the release. Seemingly, it would require the wrong to be in the nature of "wrongfully threatened illegal action" or "coercive acts". One gathers that the Board would not consider a past wrong, over and done with, sufficient, even though the resulting shaky financial condition set the contractor up to be a victim of economic coercion. We may assume it is in error about that, but its error simply cancels out its other error about the supposed similarity of the disclaimers to those in *Thompson*

*Ramo Wooldridge.* If, as we deem likely, contractor's perusal of the IFB and of the microfilms both should have led it not to depend on any help from the latter in achieving interchangeability, the supposed equitable adjustment claim loses its reality. We do not go that far because it is not necessary for present purposes.

It is to be noted, moreover, that plaintiff realized it was in trouble with the microfilms shortly after the award and put its engineers to work on them. By June 24, the work was substantially done, so that only one draftsman was engaged in that endeavor, and the prototype project was considered ahead of schedule. Certain "MCW information" was still missing, but complaint about it was delayed to miss the bid opening for another WRT–1 procurement. This is a highly significant clue as to plaintiff's state of mind. Plaintiff bid $13,-950 per unit on this, but did not receive the award. Thereafter it complained openly of missing drawings and documents. It did not say it had any claim for an equitable adjustment for the bad microfilms until long after the date of the release.

■ Complaints about bad specifications can be waived if not promptly made known to the Government. This was agreed by all tribunals concerned in *Dynalectron Corp. v. United States,* 518 F.2d 594, 207 Ct.Cl. 349 (1975). That was a breach case, the defects being such that production of a satisfactory product was impossible. Here the specifications *per se* were all right and a satisfactory product could be produced by one who followed them. The Government error, if any, was not in communicating its specifications so the contractor could know and follow them. It would seem this is a lesser included wrong and the concept of waiver would be not less applicable. Delay in asserting rights prejudice the Government by running up recoverable costs. *Ling-Temco-Vought Inc. v. United States,* 475 F.2d 630, 201 Ct.Cl. 135 (1973). In a still more recent case, *Highway Products, Inc. v. United States, supra,* there was, as here, a failure by the Government in communicating technical information. Bidding in face of

knowledge the technical package was incomplete, and failure to complain promptly afterwards, were major factors in denial of relief to that plaintiff.

These matters add to the difficulty of picturing the plaintiff as the faultless or relatively faultless victim of flagrant Government wrong, the picture that has to be painted to bring the economic duress doctrine into play. It surely cannot be said that plaintiff was so clearly entitled to relief on the microfilm claim that it could not be asked to compromise or trade it off for concessions elsewhere.

■■■ 2. We now turn to the nature of the compulsion exerted on the plaintiff, allegedly, to force it to give up its microfilm claim. Even if the Government's wrong did cause contractor's financial condition, it loses the benefit of the release only if it used that condition in a coercive manner. The sweeping form of release here involved, was put before the plaintiff in connection with its request to increase the progress payment limitation from $100,000 to $150,000. The Navy advised plaintiff it would be required to pay interest and execute a "pretty tough" contract modification. (We may note again the warning to the contractor, before execution of the contract, that it would lose money on the price it bid, and the loss would lie where it fell. How difficult it is to make such predictions good!) The form of release used was intended "to bring about a disclosure of and circumscribe all present or potential claims before granting relief." This of all times was the time for plaintiff to bring up the microfilm claim, but plaintiff's representatives said nothing about it. The Board quoted and believed testimony that the Navy would have insisted on the release, but would have permitted an express exception for the microfilm claim.

Any claim that release of the microfilm was obtained by economic duress falls flat on its face before these findings. Whatever duress was used to obtain release of any other claim was not used to obtain release of a claim which only needed to be mentioned to be excepted from the release.

The plaintiff's theory in fact implies that these evil Navy officers intentionally used the plaintiff's financial distress to obtain a release of the microfilm claim. Then, however, plaintiff turns to its opposite and inconsistent reformation theory, by which both parties were thinking only of time-delay claims and therefore the release must be reformed to limit it to them alone.

■ Evidence already mentioned shows that the Navy intended the sweeping language of the release to mean what it said. Only if construed so broadly could it achieve its intended effect of smoking out undivulged claims. As to what the contractor thought it meant, the trial judge says the ASBCA found they thought it meant time-delay claims. He quotes an ASBCA finding as follows:

> * * * Appellant's representatives were disturbed by the text of the release, and feared that it would preclude a defense of excusable delay in the event that liquidated damages for delay were later assessed by the Government. * * *

He conveniently, for his theory, stops the quote there and omits the sentence that follows:

> They were also uneasy as to unforeseen consequences which might result from the comprehensive nature of the release * * *

It is perfectly plain that neither side then thought the release was limited to time-delay issues. It is true, thanks to plaintiff's coyness about the microfilm, claim, the Navy was wholly unaware of its existence. But it anticipated that claims undisclosed up to then might be brought out at later dates. The contractor was concerned because it didn't know what it might be releasing. Neither view is consistent with the proposed "reformation", which would alter the release to a meaning not the understanding of either side at the time.

It is true that both sides related the release to release of time-delay claims, which was the only kind of claim they had discussed. The trial judge's fallacy is to sup-

pose, if they thought the release included time-delay claims, they had to have thought it didn't release anything else.

Accordingly, it appears that on the release date plaintiff did not have a clear-cut claim stated, that the microfilm mess was responsible for its troubles. Its coyness about divulging the claim makes it suspect, but at best, it was a highly debatable assertion about matters the Government had tried to warn it against, and had sought to avoid any warranty about. The release was not coerced as to that claim whatever it was worth. It could have been excepted for the asking. The release was intended to be as sweeping and extensive as its language. It was so understood by both parties to it. We conclude, therefore, that the ASBCA decision is correct as to result, and it should be affirmed.

Of course we will not be understood as awarding any laurels to the Government for its procurement policy here displayed. It may perhaps be deemed reprehensible to lure a small company into a difficult contract that could only be performed successfully with full Government cooperation as to divulging the details of the technical design, to state in the small print of the IFB that such cooperation is not guaranteed, to withhold it in fact, whether purposely or from inability to do more, and to take advantage of the resultant economic weakness to extract a release for small consideration. The Government can do all this under our decisions, but it is natural that courts will try to rescue the contractor from the consequences of its folly when they think they see their way clear to do so. It therefore becomes difficult to enforce a policy that the loss incurred by the contractor will remain its loss, however stoutly the Government representatives assert it. In this case, however, to shift the loss requires misapprehension of the record and of the decided cases.

Accordingly, the plaintiff's motion for summary judgment is denied. The defendant's motion for summary judgment is granted. The petition is dismissed.