NICHOLS, Circuit Judge,
dissenting.
I respectfully dissent. I would reverse the Claims Court and reinstate the ASBCA decision which I find perfectly correct. Parenthetically, neither the panel nor the trial judge give the citation of the board decision they reverse. It is 79-2 B.C.A. ¶ 14,165 (1979), and is well worth reading.
This case once more poses the question: suppose the government makes a contract, ostensibly for production, but actually for creative engineering, because of gross defects in the government-furnished model article, and its drawings (GFP), what can it possibly say by way of warnings and disclaimers in the bid papers to avoid being held liable for breach of warranty, or for requiring extra work? The answer to this has been uncertain, but arguably there was nothing it could have said. It might just as well award cost-type contracts in such cases and forget about fixed price procurement. *1362 However, the Court of Claims’ panel in Rixon Electronics, Inc. v. United States, 536 F.2d 1345 (Ct.Cl.1976) undertook to hold that the warnings and disclaimers in such cases can be effective, when sufficiently sweeping and explicit. They were thought in that case to say so much they could not have been written to say more, so a contrary holding would simply have amounted to the position that liability could not be limited by any contract language. The opinion conceded it might be reprehensible to fasten a losing contract on an over optimistic contractor in this fashion, but reprehensible or not, the government could do it, we said. The board here relied on Rixon more than on any other precedent, and rightly in my view. In later phases of this case there seems to have been a concerted effort to consign Rixon to oblivion. The lengthy opinion by the trial judge mentions it only to distinguish it on quite spurious grounds, as will be shown. Clearly Rixon now is seen as an aberration which is best forgotten, and clearly the government is not to be allowed to do what it attempted to do here. It was conceded by the panel in Rixon, 536 F.2d at 1354—
* * * [I]t is natural that courts will try to rescue the contractor from the consequences of its folly when they think they see their way clear to do so. It therefore becomes difficult to enforce a policy that the loss incurred by the contractor will remain its loss, however stoutly the Government representatives assert it. * *
It not only now becomes difficult, it becomes downright impossible.
The trial judge, distinguishing Rixon, relies on Thompson Ramo Wooldridge Inc. v. United States, 361 F.2d 222 (Ct.Cl.1966) as almost identical to the case before him. It too involved defective drawings on microfilm. “It is rare,” he says, “that we are afforded the luxury of a precedent so close on its facts.” To enjoy this luxury he blinds himself to a truly enormous difference. Plaintiff there relied on an express contract commitment allowing it to surrender any defective GFP, or repair it if so directed, and in either case to obtain an equitable adjustment. This seemed to contradict disclaimers somewhat like the ones at bar. In view of this contradiction, the court limited the scope of the disclaimers, as it said, more than it otherwise would have done. Here we have no such equitable adjustment provision, and, therefore, nothing to limit the natural import of the disclaimers. By leaving out the equitable adjustment clause for faulty GFP, NAVELEX here did exactly what Thompson Ramo Wooldridge instructed them to do to make the disclaimers effective. I am at a loss how, in adjudicating a claim for defective GFP, anyone could consider the presence or absence of such a clause in the contract as a matter of no moment.
One needs, perhaps, to know that in Rixon the panel substituted its own opinion for the plaintiff which a trial judge had submitted. This latter would have held Thompson Ramo Wooldridge Inc. to be an indistinguishable precedent, and that plaintiff was not bound by the release it had signed because the release was extorted by wrongful contract administration and economic duress. We rejected both holdings.
This case differs from Rixon, however, in that there too there was a provision for equitable adjustment for faulty GFP. Here we have none. Here the government disclaimers and warnings were matched before award by assurances from the contractor’s side that they were well aware the drawings were defective. It is asserted now that these assurances related to certain defects then known but not to others later discovered. Certainly, however, the derogatory comments by the contractor on the drawings so far investigated were intended to convey and should have conveyed that the contractor expected the entire package to be defective in like manner. The contractor said:
Teledyne, in its investigation of the drawing package, has found numerous instances where errors or conflicting information exists, and the drawing review is not yet complete. Teledyne expects that there are many more discrepancies as yet undiscovered.
*1363 The government people naturally wondered how it was going to get the mission accomplished by one who took such a dim view of the directives he had received. It asked—
Will Teledyne positively state that given the GFE drawings and equipment specified in the solicitation, they can produce Radio Set AN/PRC-75 in accordance with the terms of the solicitation. [No question mark as reproduced in board findings. GFE and GFP mean the same.]
Teledyne responded to this question as follows:
Given the GFE drawings and equipment specified in the solicitation as amended, Teledyne proposes to, and can, produce Radio Sets AN/PRC-75 in accordance with the terms and conditions specified in the solicitation.
But this does not mean they expected drawings or a model superior to those they had already seen. While asking the question the Navy had specified again that performance would require—
* * * [A] level of disclosure of design engineering and quality support information higher than that presently represented by the Government drawings * * *.
A very important part of the procurement was that Teledyne was to supply drawings that would replace the ones expected to prove deficient—
[T]o allow procurement of either identical or interchangeable items from alternate sources.
Yet Teledyne has persuaded this panel that the government contracted to furnish it the perfected drawings that in truth and fact it contracted to furnish the government. It was not Teledyne, but the next supplier after Teledyne, that was to be supplied perfect drawings, and Teledyne contracted to perfect them for that purpose.
Teledyne did not test the model set for electromagnetic interference, as to which waivers had been granted, but the contract expressly disavowed that the set was accepted under specifications the same as those in the then award. I fail to see any difference between this and a statement that some specifications had been waived.
A judicial tear or two were shed for Rixon, a small company bankrupted by one ill-advised government contract. Teledyne does not rate this kind of tribute. It must have been prepared both mentally and financially for a loss contract. Its own original bid would have been $3,400,000, but before submission it cut this figure to $2,629,001. The original figure would have been the lowest, the previous sole source bid $3,500,019. Since the low bid was 17 percent below the government cost estimate, the government requested Teledyne to verify its bid, which it did. The government also required a performance guarantee by Teledyne’s parent corporation, because the bid was considered unrealistically low. The board found that the procurement agency, NAVELEX, did not deem the price offered to be a “buy in” though the suspicion must at least have crossed its collective mind. One wonders what NAVELEX would consider to be a “buy in.”
But it is absurd for the government to award fixed price contracts under such circumstances and expect the fixed price to stick. The soft hearted judiciary will always frustrate any such expectation.
This case is an example, to my mind, of the unfortunate consequences of old Court of Claims Rule 166(b). By this the initial reference of a case to a “commissioner,” later trial judge, was not suspended by cross-motions for summary judgment if, but only if, it was a Wunderlich review, 41 U.S.C. § 321. This apparently peculiar distinction is explained by history. From passage of the Wunderlich Act in 1954, the Court of Claims had held that the Act left open for decision by the court issues of the factual variety such as the court had considered in contract disputes cases in former times. Thus an appeal in a contract case normally went to a “commissioner” who reported the facts to the court unless no facts were in dispute. However, in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), the Court held that by the Wunderlich Act the fact findings of appeal boards bound courts if supported by substantial evidence, and *1364 the Court of Claims therefore had no fact finding but merely an appellate role. See Vol. II, Court of Claims History at 110 and ff. This meant a drastic shift in Court of Claims workload, the “commissioners” still so called, being left with a prospect of nothing to do in the area of Wunderlich cases, but on the other hand, a contractor dissatisfied with an appeal board would often perceive, if he had made a proper record with the appeal board, he could still litigate fact issues in the Court of Claims in the guise of substantial evidence issues. The difference would be, the part of the Court of Claims he would litigate them in, the “appellate” rather than the “trial” division. Thus arose a peril of a workload not planned, budgeted or staffed for, in the “appellate” division, while the “trial” division was left with nothing to do in an area that had been for them most important and for which they had been hired.
The solution put forward by some managerial genius, and adopted by the court in the rule referred to, was to put the load back on the shoulders it was thought had been employed to bear it, by requiring parties to Wunderlich appeals to cross-move for summary judgment to get their contentions before the court. By Rule 166(b) the “commissioner” was to refer Wunderlich cases involving pure issues of law back to the court, but on other cases he was to prepare an “opinion" on the issues. Normally it was a recommended decision for adoption by the court. This “opinion” normally was issued only after briefing by the parties and frequently consumed a large amount of time, during which the “appellate” or Article III judges never heard of the case. It introduced a three-tier procedure for resolution of contract disputes in lieu of the two-tier procedure the legislation, and the Supreme Court had apparently visualized, i.e., board and court. Parties had to bear the cost of an extra round of briefing. No interest ran during the extra delays that were caused before final judgment. There may be and no doubt is a great difference between the effect of the substantial evidence and the preponderance standards when it is a matter of evaluating credibility of witnesses, e.g., as in labor disputes, but as a practical matter, in contract disputes there was no operational difference very often because the decisive facts reposed in documents or uncontroverted testimony. The fact finders of the Court of Claims, referred cases that turned largely on the facts, naturally went happily to work and produced new sets of fact findings, ostensibly recommended opinions. Thereafter, a new set of exceptions and briefs being required for the Article III court, the parties naturally built their case around or upon or against the commissioner’s fact findings, while those of the board tended to be ignored.
During the years since the Wunderlich Act, the contract appeal boards have become more “judicialized,” more imbued by concepts of due process, professionally upgraded, and far more often than not, truly impressive in the quality of their product. It did not serve the ends of justice to drop their decisions into limbo. With all respect to our excellent trial judges, there was not any real reason to think one of them was intrinsically more fit to read a transcript and prepare findings from it, than was a whole panel of administrative law judges.
In recent years the Court of Claims adopted the practice of intercepting some of the Wunderlich cases and deciding them even if they presented one or two substantial evidence questions along the way, thus performing its appellate function in a proper manner. The Contract Disputes Act of 1978, 41 U.S.C. § 601 and ff, left no doubt in §§ 607(g)(1), 609, that the role of the Court of Claims was to be appellate in reviewing future BCA decisions, but unfortunately the effective date provisions of that Act allowed old cases still to come to the Court of Claims under the old procedure. The provisions of the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, seem to provide in sections 127 and 403 that the three-tier system is perpetuated for leftover Wunderlich Act cases not brought as appeals under the new Contract Disputes Act, and thus apparently for them the three-tier system of appeal is perpetuated.
*1365 With this over long preliminary, I return to the case at hand. What we have is a Court of Claims Wunderlich Act review of a kind all too typical. We start with a board decision that appears to reflect the careful and thorough workmanship we have learned to expect of BCA decisions. Had the parties directed their arguments about it directly to this panel, we might not have found everything perfect, but I believe we would have found adequate grounds for affirmance. But instead, the case goes to a trial judge who dives into the record and comes out making a ferocious assault on the BCA decision based on an entirely different version of the facts. He puts aside as of no moment the points the board deemed decisive and instead comes up with new issues the poor benighted board never saw the importance of. As an example of this, we have the dreadful discovery that the drawings the government furnished the contractor were not the latest set extant. Had the litigants seen the importance of this, no doubt they would have furnished something quantifiable such as the number of drawings in the set furnished that were superseded in the most recent set. The contractor concluded from the outset it would have to modify some drawings to make them compatible with the sample set and to provide “adequate definition” and it looks as if this conclusion must have been based on inspection of the drawings actually furnished. The cost of correcting drawings in the set furnished that, unknown to Teledyne, were already corrected in the later set not furnished, should have been reflected in the price bid. The trial judge says, at 14, n. 17, representations were made about certain micro-circuits as “the ones most likely to be inadequate.” He finds, “[i]f such representations were made, they would lend credence to plaintiff’s belief that the remainder of the Government-furnished drawings were in substantially useable condition.” But how can Teledyne expect credence to any such alleged belief by it when it had flatly stated in writing that it expected to find errors throughout the drawings? There is much dispute whether Teledyne knew that the Collins radio furnished it as a model had been accepted with waivers. The board found they did. The trial judge found to the contrary. Passing over the issue whether the evidence for the board’s position was “substantial” (certainly it existed) I find no basis for Teledyne to think there had been no waivers nor for arguing the information would have been withheld on inquiry. Teledyne was told the specifications under which the Collins set was accepted were not necessarily the same as in the instant contract. Surely it was under a duty to inquire what the differences were instead of assuming there was no difference.
The government in the contract expressed its hope that “identieality” with earlier production would be obtained and the trial judge converts this into a representation that “identieality” was already achieved by the drawings. How could plaintiff claim it understood these expressions of aspiration in this sense when it already knew at least in part how much work and effort the job would demand? The government attempted to instruct the bidder how big a job it was undertaking, and the trial judge twists this instruction into a statement that the job was already done.
I appreciate that the panel made a careful study of the transcript and exhibits and has concluded that the findings of the trial judge are not made in contravention of the rules of substantial evidence review. I would have expected this as he is experienced and able and should know these rules if anyone does. I do suggest that he has exploited the loopholes in substantial evidence review, that allow the reviewer in many circumstances to be his own fact finder, and has come up with a version of the facts drastically different from the board’s. His contention that he is drawing different legal conclusions from the same facts is disingenuous. Surely, as appellant argues, the passage in n. 17 is a fact finding, and there are many others.
Well, at any rate, the outcome of this case serves the government right and a procurement outfit such as the NAVELEX *1366 here involved does not deserve to win cases. I am only sorry the result is not reached on more judicially supportable grounds. For the future, appeals from BCA’s will be genuine appeals and will be processed as such. The three-tier procedure, of which this case is an example, will be heard of no more.