ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| American West Construction, LLC | ) ASBCA No. 61094 |
| | ) |
| Under Contract No. W912HY-10-D-0039 | ) |

APPEARANCE FOR THE APPELLANT: Ryan J. Klein, Esq.
    Sherman & Howard L.L.C.
    Colorado Springs, CO

APPEARANCES FOR THE GOVERNMENT: Thomas J. Warren, Esq.
    Acting Engineer Chief Trial Attorney
    Katharine S. Talbot, Esq.
    Alexandria P. Tramel, Esq.
    Engineer Trial Attorneys
    U.S. Army Engineer District, Fort Worth

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

This appeal is before us pursuant to the expedited proceedings provided for by Board Rule 12.3[1]. In this appeal, the government seeks to recover, from a contractor, cost savings that the contractor realized by performing a construction contract using less expensive means than those specified by the contract. Here, we find in favor of appellant, American West Construction, LLC (American West), because even though the government did have the right to insist upon compliance with its specifications, it waived that right.

## SUMMARY FINDINGS OF FACT

The above-captioned contract is a multiple award task order contract (or "MATOC," as such vehicles are often known) for design-build construction services in the southwestern United States (R4, tab 1 at 3). It was awarded by the United States Army Corps of Engineers (the government or the Corps) to American West on 27 September 2010 (*id.* at 2). Amongst the MATOC's provisions was the standard "Changes clause," Federal Acquisition Regulation (FAR) 52.243-4, CHANGES (JUN 2007) (*id.* at 198). On 13 August 2015, the Corps issued Delivery Order 02 (DO2) on the MATOC, in the

---

[1] Appellant originally sought to proceed pursuant to Board Rule 12.2, but waived that request in order to proceed with a mediation that was ultimately cancelled. At the subsequent hearing on the merits, appellant requested to proceed via Rule 12.3, which we allowed.

amount of $2,599,430, to American West (R4, tab 2 at 503). DO2 is the central contractual document in this dispute.

DO2 was for the construction of bridges over irrigation canals in El Paso County, Texas, near the border with Mexico (R4, tab 2 at 502-07). To access the site of one of those bridges, "the Herring bridge," DO2 provided for the construction of two temporary bridges over another canal and a drainage ditch (R4, tab 2 at 550, 763; tr. 1/17-21). These temporary bridges were to be disassembled and removed after completion of the Herring bridge that was one of the objectives of DO2 (R4, tab 2 at 763).

American West was concerned that it would not have enough time to complete the project in the time required by DO2 if it built the temporary bridges, especially given seasonal constraints related to use of the irrigation ditches based upon agricultural needs. Instead, it sought access to the construction site via a levee on property held by the El Paso County Water Improvement District (the Water District, also known as "the Ditch Company"), which it and J.D. Abrams, the subcontractor that would perform much of the work for American West,[2] believed would be quicker, safer, and more efficient. (Tr. 1/176-77, 237-38) Because it could not be sure that it would obtain the easement until the negotiations were successful, J.D. Abrams made preparations to use temporary bridges if the easement was not approved (tr. 1/250). J.D. Abrams incurred costs of approximately $20,000 to ensure the availability of temporary bridges (*id.* at 252).

The first indication in the record that American West gave to the government that it intended to utilize the levee route, instead of the temporary bridges contemplated in the contract, was in the Construction Site/Traffic Control Plan that it submitted to the Corps on 23 September 2015 (*see* R4, tab 3). The government reviewer of this plan noted on the accompanying form that, "Haul roads provided in this submittal have not been approved by the government as provided in the contract documents. Provide required permits and approvals for using these roads." (*Id.* at 3293) In the agenda for a meeting between the parties held on 27 October 2015, American West noted, "Permits in hand except access road, but we can use USACE dictated routing till licensed by Ditch Co for Herring (forthcoming)" (ex. A-4 at 1).

The necessary permit was, indeed, forthcoming. J.D. Abrams paid the Water District $1,000 on 13 October 2015 to consider its request for an easement and to price it, then paid the Water District the $13,200 it ultimately wanted for the easement on 30 October 2015 (supp. R4, tab 18, tr. 1/207-08, 242-43). The easement was executed by a representative from J.D. Abrams on 28 October 2015, and by the Water District

---

[2] J.D. Abrams's contract with American West was a firm-fixed-price contract and it passed neither its cost savings nor increased expenses to American West (tr. 1/251).

on 10 November 2015 (R4, tab 9 at 3501; tr. 1/209-11). The agenda for the parties' weekly construction meeting, held on 3 November 2015, noted that American West had obtained the easement from the Water District (app. supp. R4, tab 23 at 4).

Although the Corps never explicitly approved a plan using the Water District levee in lieu of the bridges (*see* tr. 1/61-63), this lack of approval did not ultimately prevent American West from proceeding with and completing the construction without using, or ever constructing, the temporary bridges (tr. 1/98, 102).

Mr. Ramon Macias was the resident engineer and administrative contracting officer assigned to the project for the Corps (tr. 1/53). He had oversight responsibilities for all Corps construction in the geographically extensive El Paso office area of responsibility (tr. at 52). Mr. Macias testified that he was aware of the proposal to use the levee instead of the temporary bridges in the Fall of 2015 and that he did not object so long as it was "equitable to the government" (tr. 1/61), by which he meant the costs would be about the same (tr. 1/64). He further testified that he had a brief, in-person, discussion with the American West project manager, Mr. Jude Kolb, to that effect in late October 2015 (tr. 1/62-63). Mr. Kolb testified that he did not recall such a conversation (tr. 1/215).

Mr. Macias also testified that he raised the issue of a government credit for waiver of the temporary bridge requirement with American West (primarily, Mr. Kolb) monthly, starting in the mid-December 2015 timeframe (tr. 1/79-80). Mr. Macias did not contemporaneously document these discussions, but testified that he directed the project's quality assurance representative (QAR), Mr. Arturo Aranda, to make notes of important discussions in the daily reports that he kept (tr. 1/99-100). There are no notes in these daily reports touching upon the temporary bridges issue until 2 March 2016 (tr. 1/112-13; *see* supp. R4 at 3825). Mr. Kolb testified that, to his recollection, this was the first time that the subject of a credit for the temporary bridges was raised with him (tr. 1/215).

The hearing judge closely observed the demeanor of both Mr. Kolb and Mr. Macias during their testimony at the hearing and found both to appear credible: more likely than not, both testified truthfully regarding their recollections. We reconcile the disparity in testimony by consideration of the daily reports, which did not reflect the discussions recalled by Mr. Macias until 2 March 2016. The most likely cause of this is that, even if Mr. Macias did raise the credit issue on occasion before 2 March 2016, it was done in an off-hand manner that neither registered with Mr. Kolb, nor Mr. Aranda, who did not find it noteworthy.

The construction schedule submitted to the Corps by American West was never amended to remove the installation of the temporary bridges (which it originally included), but, in the 23 December 2015 submission of the revised schedule, the

3

bridges entry was altered to add the annotation "(Paid Permit)" to the line that previously only read, "Install Temporary Crossings Chicken Ranch Road" (R4, tab 5A at 3371; tr. 1/75). This change was not identified as such in the portion of the submission where such changes were usually to be brought to the government's attention (R4, tab 5A at 3361; tr. 1/75). Because this schedule formed the basis for American West's progress payment requests to the government (*see* tr. 1/76-77), American West, on 23 December 2015, submitted a request for progress payments that included construction of the temporary bridges, though they were not, in fact, built (R4, tab 6 at 3457; tr. 1/149-50).[3] Mr. Aranda (the Corps QAR), who was on site many days of construction (tr. 1/154) (and thus, was aware that the temporary bridges had not been built), approved and directed payment of this request (tr. 1/150). Later in January 2016, Mr. Aranda would consider this payment to have been an error, but he did not seek to recover the money (tr. 1/150-53). Mr. Aranda brought the payment to the attention of Mr. Macias sometime that month (tr. 1/150). Nothing appears to have occurred thereafter, but things began to come to a head at the end of February/beginning of March 2016.

American West re-submitted its revised Construction Site Plan/Traffic Control Plan to the Corps on 23 February 2016 (*see* R4, tab 9). Two days later, the government reviewer wrote:

> Code C, APPROVED, EXCEPT AS NOTED.
> RESUBMISSION REQUIRED
>
> Herring - Haul road provided in this submittal has not been approved by the government as provided in the contract documents. Provide required permits and approvals for using these road [sic].

(*Id.* at 3478) The license from the Water District had, in fact, been provided with this submittal by American West (*id.* at 3494-501). On 2 March 2016, as noted above, Mr. Aranda asked Mr. Kolb for the contractor's budgeted temporary bridge costs so that the government could receive a possible credit for permitting American West to avoid building the temporary bridges (supp. R4, tab 15 at 3825). The next notation regarding this matter was the 4 April 2016 daily report, in which Mr. Aranda noted that he had not received a reply to his previous request to Mr. Kolb (*id.* at 3879). On 5 May 2016, Mr. Aranda made a remark in the daily report about negotiations regarding the temporary bridge being "in progress" (*id.* at 3931), which was repeated

---

[3] We do not believe the progress payment request was meant to be misleading since the Corps plainly knew that the bridges were not built. The most reasonable understanding of the submission is that the "bridges" task was seen as being subsumed by obtaining of the easement for the same purpose.

verbatim in subsequent daily reports until 10 May 2016 (*id.* at 3933, 3937, 3939). The project was substantially complete on 12 May 2016 (*id.* at 3943).

On 1 June 2016, the Corps, through Mr. Macias, sent a letter to American West demanding that it submit a proposal to the Corps for proceeding without the temporary bridges, setting forth the savings to which the government would be entitled (R4, tab 10). Not surprisingly, on 7 June 2016, American West responded to this letter by denying any obligation to give the government such a credit (R4, tab 11). The Corps sent a rebuttal letter on 18 July 2016 to American West (R4, tab 12) and on 2 August 2016, American West wrote a letter (R4, tab 13) to the Corps, again disputing its obligation to provide the government a credit. On 19 December 2016, the Corps issued a contracting officer's final decision, asserting that the Corps was owed $40,239.89 as a credit for the estimated difference in price between performing the project with the temporary bridges and performing it without them[4] (R4, tab 14). The record does not detail whether the government has, in fact, collected this credit.

American West submitted a timely appeal to the Board on 14 March 2017, which we duly docketed as this appeal.

## DECISION

The evidence before us supports a finding in favor of American West; although the government was entitled to strict compliance with DO2's specifications, including the installation and removal of the temporary bridges, it lost its entitlement to any credit under the Changes clause by waiving its right to such work prior to insisting on such compensation.

I.    The Government was Contractually Entitled to Construction of the Temporary Bridges and to a Credit for Work not Performed

First, it is clear that the government was entitled to require American West to build the temporary bridges. The terms of DO2 required American West to build the bridges and American West has presented no serious argument otherwise. To be sure, there was no need for such bridges after the contract was completed, and it appears that all concerned were better off because they were never built, but it has long been held that the government "can engage a contractor to make snowmen in August, if [it spells] it out clearly." *Rixon Electronics, Inc. v. United States*, 536 F.2d 1345, 1351 (Ct. Cl. 1976); *see also The Wagner Awning & Mfg. Co.*, ASBCA No. 19986, 77-2 BCA ¶ 12,720

---

[4] This calculation did not take into account the costs incurred by J.D. Abrams to secure temporary bridges for the contingency in which the easement was not approved by the Water District (R4, tab 14).

at 61,827 (government entitled to strict compliance with contract terms even if alternative techniques might be suitable).

The law also provides that, when a contractor fails to perform required work required by a contract, the Changes clause permits the contracting officer to make an equitable adjustment to deduct from the payment owed the contractor the cost that the contractor would have incurred if it had complied with the contract. *Fox Construction, Inc.*, ASBCA No. 55265 *et al.*, 08-1 BCA ¶ 33,810 at 167,370-71, (*citing Celesco Industries, Inc.*, ASBCA No. 22251, 79-1 BCA ¶ 13,604 at 66,683). This statement of law is unchallenged by American West.

## II.     The Government Waived Its Right to Construction of the Temporary Bridges and thus Its Right to a Credit

We now turn to the prime argument raised by American West; whether the government waived its right to compliance with the contract terms regarding the temporary bridges (*see* app. br. at 1-6). We find that, in the facts presented here, it did so waive that right.

The law provides that the government may waive strict compliance with contractual requirements and be estopped from later re-imposing those requirements upon the contractor. *See, e.g., Gresham & Co. v. United States*, 470 F.2d 542, 554 (Ct. Cl. 1972) ("There can be no doubt that a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead"); *Worldwide Parts, Inc.*, ASBCA No. 38896, 91-2 BCA ¶ 23,717 at 118,712; *Walsky Constr. Co.*, ASBCA No. 36940, 90-2 BCA ¶ 22,934 at 115,125; *see also Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 687-88 (1994). That is what happened here.

There is no dispute that the government (in the guise of Mr. Aranda and Mr. Macias) was well aware of American West's decision to use the Water District's levee, rather than the temporary bridges, as a means to build the permanent bridges. American West told the government of these plans on multiple occasions in the Fall of 2015 and, of course, the government was on site and able to observe that American West had not installed temporary bridges as construction progressed. Though the government technically rejected the 23 September 2015 traffic control plan that included the use of the Water District levee, that rejection appears to have been predicated upon the uncertainty of obtaining a permit from the Water District. The subsequent preconstruction meeting held in October 2015, in which American West informed the Corps that its agreement with the Water District was imminent and in which the government made no signal discouraging American West from proceeding with the levee plan, gave American West good cause to believe that the government

6

was satisfied with its plans to forego the temporary bridges. Indeed, the government made progress payments to American West in late December 2015, without objection, for the line item regarding the levee license agreement. The government's February 2016 rejection of the revised traffic plan for supposedly not including evidence of the Water District permit, in addition to being demonstrably incorrect (a copy of the permit having been provided), evinced no real objection of the plan to proceed without the temporary bridges. A reasonable contractor reviewing it and considering all of the other facts and circumstances surrounding its use of the levee would find no reason to be concerned that the Corps, in fact, wished it to build the temporary bridges.

American West not only believed that it had the government's consent, but it also relied upon the government's acquiescence to the levee plan. It proceeded without building the temporary bridges, and it also incurred $14,200 in fees to the Water District to obtain the right to use the levee. Thus, we find here, as the Court of Claims held in *Gresham*, that the contract requirement for the temporary bridges was "dead." *See* 470 F.2d at 554.

The government argues that, while it may have permitted deviation from the contract, that allowance was essentially conditional upon an equitable adjustment from American West (*see* gov't br. at 2). Relying upon *Norcoast-Beck Aleutian*, ASBCA No. 25469, 81-1 BCA ¶ 15,072, the government asserts that it may permit a deviation from the contract requirements while still availing itself of the opportunity to obtain a credit (gov't br. at 4-5). These arguments are unavailing.

First, the evidence before us leads us to conclude that the conditional nature of the government's waiver only became evident *after* the contractual requirement was effectively eliminated. Thus, the Changes clause cannot be considered applicable because the terms of the contract no longer required American West to build the superfluous temporary bridges at the time it was invoked.[5]

With respect to *Norcoast-Beck Aleutian*, that appeal is easily distinguished. In *Norcoast-Beck Aleutian*, the government never agreed to accept lesser contract performance than required; it merely took occupancy of a building after it became clear that the contractor would not fully comply with contractual requirements. The deductive change came a "reasonable time later." 81-1 BCA at 74,550-51. Because there was actual waiver of the original contract requirements in the present appeal, *Norcoast-Beck Aleutian* is simply inapplicable.

---

[5] The outcome of this appeal may well have been different if the Corps had clearly and explicitly conditioned its waiver of the contractual requirements at an earlier date, but that circumstance is not before us.

## CONCLUSION

For the reasons stated herein, we hold that the Corps waived the contractual requirement to build temporary bridges and, with that waiver, surrendered its right to obtain a deductive change. The appeal is sustained.

Dated: 19 December 2017

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

DAVID D'ALESSANDRIS
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61094, Appeal of American West Construction, L.L.C., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

8