PER CURIAM.
This government contract case comes before us on appeal from the United States Claims Court.* It arises in the context of a Wunderlich review of a decision of the Armed Services Board of Contract Appeals. 41 U.S.C. §§ 321, 322 (1976). On appeal by the Government two major issues are posed:
(1) whether the trial judge improperly made de novo fact findings; and
(2) whether the Government was liable due to warranties made in the contract for delivery of an outdated drawing set to the contractor or whether the contract’s disclaimer relieved the Government of any liability.
Judge Spector held that the contract’s disclaimer did not relieve the Government from liability when it delivered a drawing set that was outdated in that it was not the most recent set in its possession nor was it a drawing set that conformed to the model furnished by the Government. He found that the drawing set delivered had not met the warranties made in the contract. He further held that the Government’s waiver of certain EMI (electromagnetic interference) specifications under the contract was not an accord and satisfaction of the contractor’s EMI claims. Thus Judge Spector held that the contractor was entitled to recover the costs, including delay costs, of the review it undertook when it discovered it had an outdated drawing set, and the costs it incurred in trying unsuccessfully to eliminate the EMI difficulties which persisted despite conformance to the control plan approved by the Government. We agree.
We have made a careful and full review of the voluminous record in this case, consisting of 364 pre-hearing exhibits plus additional exhibits offered at the hearing and 2,636 pages of transcript. We find that the trial judge did not improperly make de novo fact findings. The trial *1338 judge primarily adopted the fact findings of the Armed Services Board of Contract Appeals. In only a few instances did he actually reject the board’s findings. In those instances we hold that those facts found by the board were not supported by substantial evidence. We further hold that Judge Spector was correct in his legal analysis. The analysis and legal conclusions drawn by the board are not entitled to any finality. 41 U.S.C. §§ 321, 322. Its decision was based upon one interpretation of the contract provisions by which neither Judge Spector nor we are bound. We fully agree with Judge Specter’s opinion, which is appended hereto, and therefore affirm on the basis of that opinion. We wish, however, to add a few comments in response to the Government’s appeal.
The appellant argues the trial judge improperly found there was no evidence to support the board’s finding that appellee knew the prior contractor received waivers. The portions of the transcript cited by the board to support that finding do not, however, even concern that question. Appellant, now, first points to one individual’s brief statement, not cited by the board, to support its argument. Although the testimony cited does mention waivers, it does not mention what the waivers were. The only relevant waivers in this decision are those waivers given the prior contractor for the EMI specifications. The testimony appellant points to makes no mention of these particular waivers. Indeed, it is entirely unclear what the brief mention in the record refers to. There is no other mention in the record that appellee knew about the waivers. The Claims Court therefore properly found that the board’s finding in this regard was not supported by substantial evidence.
Appellant contends the trial judge found facts contrary to those of the board with respect to the pre-proposal conference. The trial judge, however, simply observed in footnotes that appellee’s testimony was contrary to the board’s finding. He, nonetheless, adopted the board’s finding.
Appellant also argues there is no evidence the drawing set given appellee was outdated in relation to a later drawing set. The board, however, found the appellee did not receive the most recent drawing set in the possession of the Government. Board decision at 16. Appellant contends that even if there were two sets of drawings, the record is devoid of evidence that there were any differences between the two sets. Our review of the record shows that there were revision level changes made from the date of the first drawing set to the date of the second drawing set. More importantly, this is not critical to the decision of the Claims Court. What is important is that the appellee’s actions were reasonable in light of the fact it discovered it had an outdated drawing set. The record contains detailed evidence demonstrating that appellee’s drawing set did not conform to the model supplied by the Government and that others had informed appellee it had an outdated drawing set. Prior to award of the contract appellee was allowed under the bidding procedures to look at the model but not to take it apart. Thus there was no way for the appellee to know that the drawings did not conform to the model. Further, appellant’s assertion that the issue of outdated drawings was not raised before the board is erroneous since the board made findings about this. Board decision at 16.
In addition, appellant argues that the decision of the Claims Court is incorrect since the board found appellee failed in its burden to show the drawings were inadequate. It is true the board made this finding; this finding, however, is irrelevant to the legal reasoning of the Claims Court. The decision of the Claims Court rests upon the conclusions that appellee’s detailed analysis of the drawings and the resultant delay were reasonable in light of the contract and the fact that appellee had an outdated drawing set.
Lastly, we wish to emphasize that we find this case similar to Thompson Ramo Wooldridge, Inc. v. United States, 361 F.2d 222 (Ct.Cl.1966) and distinguishable from Rixon Electronics, Inc. v. United States, 536 F.2d 1345 (Ct.Cl.1976), upon which the *1339 board relied. In Thompson, the Government was held liable for delivery to the contractor of unusable microfilm despite disclaimer language that seemed to negate the representations made in the contract concerning that government furnished property. In both Thompson and this case, the government furnished property was expressly stated to be of assistance in meeting the interchangeability requirement. The court in Thompson, in construing the same disclaimer language as in the instant case, held that the disclaimer did not nullify the representation made regarding the purpose for which the government furnished property was supplied. Although the contract in Thompson expressly provided for an equitable adjustment if the government furnished property was inadequate, a provision not in the contract at issue now, we find that difference to be inconsequential. The warranties made by the Government in the instant contract cannot simply be ignored because there was no equitable adjustment clause.
The present case clearly differs from Rixon since that decision rested upon a release of the contractor’s claims that the contractor failed to prove was due to duress. Further the court in Rixon distinguished its case from Thompson by stating that there was “no statement * * * in the contract that the microfilm [was] usable for interchangeability.” 536 F.2d at 1350. For that same reason Rixon is also distinguishable from the present case.
We have considered all the other contentions of the appellant and find them to be meritless. The decision of the Claims Court is affirmed.
AFFIRMED.
APPENDIX
The opinion of Judge Spector of the Claims Court follows:
This case involves review of a decision of the Armed Services Board of Contract Appeals (“ASBCA” or “Board”) under the Wunderlich Act.[1] Presented are two related claims alleging constructive changes in the contract by reason of the furnishing by the Government to the plaintiff of outdated manufacturing drawings, and of a model produced under a prior contract which did not meet the electromagnetic interference requirements of the specifications. The Government responds that it effectively disclaimed responsibility for the outdated drawings and for the noncompliant model which it had furnished.
STATEMENT OF FACTS[2]

Introduction

We have here a case involving the design and manufacture of the AN/PRC-75 radio set, a portable, self-contained ultrahigh frequency (UHF) radio transceiver. The set is battery-powered, weighs approximately 10V2 pounds, and can be held and operated in one hand. It consists of six modules and 21 hybrid micro-circuits, totalling approximately 2,400 piece parts. Plaintiff is a well-known manufacturer of electronic equipment. The Government has in the past relied on it to produce a variety of sophisticated items including space telemetry, ground checkout equipment for use in the space program, and UHF transceivers for shipboard communications. Acting through the Department of the Navy, Naval Electronic Systems Command (NAVE-LEX), the Government entered into Contract No. N00039-73-C-0417 with plaintiff *1340 on October 20,1972. Plaintiff was required thereunder to manufacture and deliver a quantity of the AN/PRC-75 radio sets. The contract was the product of “two-step” formally advertised procurement. The first step solicited unpriced technical proposals, following which the second solicited priced bids on these first step technical proposals found to be acceptable. Defendant used this method because it had concluded that the data package which the Marine Corps submitted with its purchase request was not adequate for a standard, one-step, formally advertised procurement.

Earlier Production of the AN/PRC-75 Sets

There had been one earlier production contract for the AN/PRC-75 radio set. The first contract had been awarded to the Canadian Commercial Corporation (“Canadian”) on October 28, 1968.[3] Canadian had subcontracted actual production to Collins Radio Corporation of Canada, Ltd. (“Collins”).[4] The Canadian contract had initially required production and delivery of 200 radio sets. It was later modified to add 240 identical items.[5]
That Canadian contract had also required the delivery of engineering drawings prepared by Collins in connection with production. “Category E” drawings were intended to permit a later contractor to build identical items, and “Category F” drawings would enable a follow-on contractor to produce interchangeable items.[6] It should be mentioned at this point that Collins did ultimately deliver two drawing packages to defendant. The first drawing package approximately represented the radio set bearing serial number 195 under that contract, which had been produced and delivered in 1970 (“1970 package”). The second drawing package (“1971 package”) was delivered to the Government the following year and included revisions to the earlier 1970 package.
Unfortunately, Collins had been unwilling of unable to meet some of the Government specifications. Because there was a critical need for the radio sets in Southeast Asia, however, defendant granted waivers of some specifications and Collins ultimately delivered 440 radio sets reflecting those waivers. The two drawing packages delivered by Collins contained drawings of most, but not all, of the set’s components. Notably, they provided only source control drawings for the 21 hybrid micro-circuits. Although the drawings included certain mechanical outline information and defined the physical properties of the parts in general terms, they described neither the materials nor the methods required to make the parts.

The 1972 Request for Proposals Leading to This Contract

In September 1971 the Marine Corps requested that NAVELEX purchase 627 additional AN/PRC-75 radio sets, the purchase which gave rise to this case. The Marine Corps had estimated a total contract cost of $3,956,174, in contrast to a NAVELEX estimate of $3,636,000. On January 28, 1972, NAVELEX issued a “Request for Unpriced Technical Proposals” (hereinafter referred to as “Request for Proposals” or RFP). The RFP contained a number of warnings and caveats, several of which were underlined for emphasis. They indicated that a *1341 . prospective manufacturer of the sets faced unknown and possibly substantial risks.[7]
In the first paragraph of a section entitled “BACKGROUND AND GENERAL INSTRUCTIONS,” the RFP cautioned that “[a]lthough the radio set has been proven in production and there is a data package available, the current procurement will be the first competitive production buy.” It added:
The data package is untested and contains numerous source control specifications for thin film hybrid circuits for which a source must be developed or in-house capability utilized. Additionally, a requirement exists to maintain identicality, except where specifically authorized otherwise, to reduce the impact of changes on Marine Corps Logistics and training requirements. Therefore, a technical proposal is required to establish the bidder’s competency to produce this complex, miniature UHF tactical transceiver.
The RFP noted that bidders would be expected to meet specification requirements while at the same time producing equipment to the maximum extent in accordance with the drawings carrying Marine Corps Identification Number 0628.[8] A bidder was also to explain exceptions or deviations it expected to take from either the specification or the drawings, and to identify drawings that were not compatible with the specification.[9]
In a section entitled “SPECIFIC INSTRUCTIONS FOR TECHNICAL PROPOSAL,” the RFP further indicated that prospective bidders would have to detail their engineering expertise, production capability, testing techniques, and management.[10] The RFP also stated that bidders were to list all deficient areas in the drawing package and specifications.[11] The RFP also contained a section F, which governed production equipment specifications. Among other things, section F set down interchangeability requirements.[12] It further provided that in case of any conflict between performance and interchangeability requirements, performance requirements were to govern.[13]
*1342 Section J of the RFP referred to the Government-furnished drawings and model (“GFP”). It provided that within 30 days of award, NAVELEX would furnish one radio set and a set of manufacturing drawings to the successful bidder. The provision also included a disclaimer indicating that the GFP items did not “necessarily” meet the requirements and specifications of the proposed contract in every respect. It stated that the model and drawings were provided to assure “maximum identicality with the model” consistent with the specifications.[14]
The contract also contained specified electromagnetic interference (“EMI”) requirements. These were designed to enable the radio set to transmit a signal on a given frequency without also transmitting potentially interfering signals on other frequencies, and to receive a particular signal without interference from extraneous signals.

Preparation of First Step Proposal by Plaintiff

As earlier noted, plaintiff was an experienced manufacturer of sophisticated electronic equipment and reasonably believed that it had both the expertise and the facilities to produce the AN/PRC-75 radio set. On its own initiative, it obtained a copy of the subcontract which had been awarded to Collins by Canadian in connection with the first AN/PRC-75 production contract in 1968. Plaintiff noted from the prior contract that, except for the specific change in the design of the microphone, the specifications of the pending procurement were the same as those under which Collins had produced its radio sets. As a result, plaintiff felt that it could readily meet specification requirements if the drawing package which Collins had delivered with the sets it had produced, was adequate to support further production. Essential to plaintiff’s calculations, however, was the assumption that the drawing package would include a reasonable error content of no more than about 4 to 5 percent. Because the radio set was to be “physically, mechanically and electrically” interchangeable with both the PRC-75 drawings and the PRC-75 model, plaintiff also assumed that the drawings package and the model radio set produced thereunder were consistent with one another.[15] *1343 The Government’s attorney who participated in the drafting and inclusion of the “disclaimer” language dealing with the drawings, note 14, supra, testified before the ASBCA that it was the Government’s intent to supply a drawing package representative of the model, with certain specified exceptions, and that the disclaimer language was not intended to disclaim responsibility for a drawing package not representative of the model, but was intended to cover “minor errors, draftsmanship difficulties, situations where suppliers went out of existence between one time and the other,” and certain other known procurement problems. This attorney also testified that MIL-D-1000 Category E drawings such as these anticipate that, with certain exceptions normal in the industry, parts shown in the drawings are the same as those used in the radio, with the same tolerance dimensions and all other relevant features. Finally, plaintiff assumed that the model and drawings furnished represented Collins’ final revisions to the drawings and that the model had been produced and accepted in accordance with the Collins’ specifications, which were identical to plaintiff’s specifications in all respects material to the issues in this case.[16]
On February 24, 1972, defendant held a pre-proposal conference with plaintiff and other potential bidders. The Government provided the following response to written questions plaintiff had submitted prior to the conference:
For purposes of this procurement “identicality” and “interchangeability” have the same meaning as the term “interchangeability”, which is defined in Enclosure (2), Section F; Paragraph 3, Page 26. The Government desires that to the greatest degree practicable, all units and parts selected shall be the same as the units and parts detailed in the Government-Furnished drawings, I.D. No. 06828, and contained in the Government-Furnished model. [Emphasis added].
NAVELEX personnel emphasized at the conference that the drawing package was untested, and that although defendant did not know exactly what Collins had provided in the Marine Corps, it knew that the drawing package was less than satisfactory, principally with regard to schematic drawings for the hybrid micro-circuits. As a result, defendant cautioned that it could not warrant the drawing package as adequate to satisfy the requirements of the pending procurement.[17]
Plaintiff purchased and began to review a set of the AN/PRC-75 drawings furnished by the Government. It also had the opportunity to view a model of the radio set, but was not allowed to break the set down and test its parts and components. The Step 1 proposals were due within about *1344 50 days after receipt of the drawing package, and this provided a relatively short period for drawing review.
The plaintiff, Collins, Magnavox, and ASC Systems thereafter submitted responses to the first step of the RFP. Neither Collins nor Magnavox noted any significant deficiencies in the specifications or in the drawing package. Nor did ASC Systems find any specification deficiencies. ASC found only one drawing set deficiency, and this related to the thin film hybrid circuits where deficiencies were specifically forecast. Plaintiff, on the other hand, reported that “[t]he drawing package * * * is not adequate for the purpose of building the radio set due to numerous deficiencies.”[18]
In its proposal, plaintiff promised to evaluate the Government-furnished radio set “[thoroughly” against the specifications and the drawings. It would test the set “in fine detail, verify or determine minute functional details of all major subassemblies, and components with special attention given to the microelectronic modules.” It also promised to:
Resolve all conflicts between the specification, GFE [Government-furnished equipment], and drawings in the manner prescribed and produce documentation which defines equipment in compliance with specification], with maximum identically to the GFE sample and with maximum compliance with the Marine Corps drawing packaged[19]!
Plaintiff also promised to modify the drawings and develop additional drawings, to produce supplementary data, and “to correct errors or to make them [the drawings] compatible with the GFE and/or the specification.” Plaintiff remarked that the drawing package did “not in every way represent a workable radio set,” but promised to undertake a drawing verification based on an examination of the model set that defendant was to furnish and which *1345 was presumed to be an acceptable model. Plaintiff specifically noted in that respect that:
The assumption is made that the GFE is built correctly and also that it represents all like nomenclatured equipment that the Government must logistically support. Therefore, any conflict between the drawings and the GFE will be resolved in favor of the GFE to insure that the maximum of identicality is achieved, provided that such does not conflict with any other specification requirement. The specification shall be the controlling document in event of conflict between the GFE and the specification. [Emphasis supplied].
Plaintiff further stated that it would revise drawings which required change to meet the specification requirements or to match the Government-furnished equipment.

Plaintiffs Second Step Proposal

On April 20, 1972, defendant announced that plaintiff, Collins, Magnavox, and ASC Systems would be eligible to take part in the second step of this “2-step” procurement as earlier described.[20] Defendant addressed written questions to each of the prospective bidders. One of the questions posed to plaintiff was as follows:
12. Deficiencies. On page 15 of your proposal it is stated that the drawing package “is not adequate for the purpose of building the radio set due to numerous deficiencies.” The discussion then points out several inconsistencies, errors and ommissions [sic] in various drawings. Will Teledyne positively state that given the GFE drawings and equipment specified in the solicitation, and under the terms specified in the solicitation, they can produce Radio Set, AN/PRC-75, in accordance with the terms of the solicitation.
Plaintiff replied to this question on May 12, 1972, as follows:
12) Given the GFE Drawings and equipment specified in the solicitation as amended, Teledyne proposes to, and can, produce Radio Sets AN/PRC-75 in accordance with the terms and conditions specified in the soliciation [sic][21]
Defendant had modified its Request for Proposals on May 5, 1972. One important modification required the successful contractor to update the Collins’ drawings, with specific emphasis once again on the drawings of the film hybrid circuits.[22] An enclosure to the modifications requested that plaintiff confirm its ability to meet these additional requirements. In its *1346 above-mentioned reply of May 12, 1972, plaintiff also responded to the May 5, 1972 modifications, stating that it would provide drawings incorporating the change in the microphone, and describing the hybrid micro-circuits. It also agreed to provide:
Other drawings that are determined to be in conflict with the GFE such as those listed in paragraph 3.1.5 of Teledyne’s proposal * * * and all others resulting from the drawing verification which will be required in order to fulfill the requirements of 3.4.1 of MIL-R-82196A, as amended![23]!
In its letter of May 12,1972, plaintiff also raised additional points which should be noted at this time. Firstly, it requested that defendant provide at least two AN/PRC-75 model sets to support the proposed program. Plaintiff proposed to keep one set intact and use it as a functional standard during the program, while the other could be disassembled without fear of altering the validity of that unit as a functional standard. Secondly, plaintiff proposed to review the drawing package for a period of 30 days after contract award. During this time plaintiff planned to prepare a list of apparent deficiencies, which it would resolve by checking against the Government furnished model. Plaintiff allotted an additional 7 days to reconcile the list of apparent deficiencies, with the model.[24]
Plaintiff ultimately submitted a bid of $2,629,001. This was far less than the Collins bid of $3,500,019, and the ASC Systems bid of $3,559,920.[25] Plaintiff’s bid also represented a substantial reduction from its original (and admittedly conservative) internal computation of $3,400,000. The reduction stretched to the limit what plaintiff considered reasonable in a competitive climate.
Defendant noted that plaintiff’s bid was unusually low, being 17 percent lower that defendant’s final estimate. Plaintiff was therefore asked to confirm its bid, which it did. At defendant’s request, plaintiff also provided a performance guaranty from its parent corporation. From its pre-award surveys, defendant had concluded that both plaintiff and its subcontractor, Micropac Industries (“Micropac”) were qualified to perform and that plaintiff’s unusually low bid resulted principally from Micropac’s low bid for the hybrid micro-circuit work.[26] But defendant did not regard plaintiff’s offer as a “buy in,” nor did it regard the resultant contract as a loss contract.

Award of the Contract

Award to plaintiff occurred on October 20, 1972. Under the contract terms plaintiff was to deliver three “first article” radio sets within one year. Delivery of the actual production quantity of 639 sets was to begin 29 months after award. The contract included a “Government-Furnished Proper *1347 ty” clause, with a disclaimer, similar to that earlier discussed.[27] The contract also contains the standard “Changes”[28] and “Disputes” clauses.[29]
*1348 The contract also contained a requirement that plaintiff submit a control plan which would reflect the engineering and design approaches it intended to pursue in satisfying the EMI performance requirements of the radio set. Plaintiff’s plan was simple and straightforward. It proposed to construct a piece of equipment identical to the Government-furnished model. Plaintiff submitted its plan without first testing the Government-furnished set to ascertain whether it satisfied the EMI requirements of the contract because it knew that the EMI requirements of the Collins contract under which it had been produced, and those requirements under plaintiff’s contract, were identical.[30] Defendant approved plaintiff’s plan, even though it had not tested the model radio set which it provided to plaintiff, and, more importantly, even though it knew that the model set produced by Collins had not in fact met all the EMI requirements and that waivers of some of those requirements had been granted under the Collins contract.
On October 24,1972, plaintiff received an AN/PRC-75 radio set bearing serial number A312, and a set of microphone aperture cards of manufacturing drawing I.D. No. 06828. Plaintiff tested the radio set against various requirements of the specification and found that it met all the requirements for which it was tested.
Shortly after it received the contract, plaintiff entered into a subcontract with Micropac for production of the hybrid micro-circuits beginning February 20, 1974.

Post-Award Difficulties

During its “30-plus-7”[31] drawing review, plaintiff discovered a substantial number of disparities between the drawing package and the model radio set itself. There were far more differences than had originally been anticipated. In response to plaintiff’s solicitations for quotations on components essential to the manufacture of the radio set, Collins Radio Company of Iowa,[32] and other suppliers indicated that there had been later revisions of the drawings pertaining to those components and that parts for which quotes had been requested, were obsolete. The revisions did not appear in the drawings which defendant had furnished to plaintiff. It then developed that defendant had provided plaintiff with the 1970 drawing package which was compiled before this model radio set had been constructed, and it did not reflect the manufacturing revisions which the Government-furnished model radio set had incorporated. Defendant had the 1971 drawing package but apparently did not realize that it had furnished plaintiff the 1970 drawing package rather than the updated 1971 package.
In early 1973, plaintiff gave defendant an engineering change proposal embodying the costs of correcting the drawing deficiencies which it had found.[33] Defendant denied any responsibility to compensate plaintiff for the drawing review, and it found the engineering change proposal to be inappropriate at that point.
On March 19,1973, a Marine Corps — NA-VELEX team visited Collins to investigate the allegedly excessive drawing revision problems which plaintiff had reported.[34] The team discovered that plaintiff had not received the most recent Collins drawing package, the one corresponding to the *1349 Government-furnished model. It nevertheless concluded that the drawing revision levels which Collins had quoted to plaintiff related to Collins’ internal drawing system and not to the Government drawing revision level. It further concluded that the variances which plaintiff reported were for the most part minor and did not prevent the parts involved from being fully interchangeable with those shown in the Government-furnished drawings.[35]
Plaintiff was concerned that it had been furnished the 1970 drawing package and also with the number of errors being encountered. It therefore embarked on a full review of each of the 874 drawings which it considered essential to the manufacture of the radio set. It found that 273 drawings required correction, updating, or both. This represented an error rate of approximately 31 percent which was much larger than the 4 to 5 percent error rate plaintiff had originally anticipated.[36] The drawing review and correction process also delayed plaintiff’s overall production program by approximately 7 months because it involved a detailed comparison of each drawing against the Government-furnished model down to the piece-part level.

The EMI Testing

In August 1974, plaintiff performed EMI tests on its newly manufactured “first article,” radio sets, each of which failed. Moreover, the nature of the failures varied from set to set. Plaintiff next tested the Government-furnished radio set and this resulted in similar failures. When plaintiff notified defendant of the EMI test failures, defendant responded by advising plaintiff that its first article delivery was late, and that it expected a detailed report on plaintiff’s problems and proposed corrective action. It also offered suggestions and comments to clarify testing procedures. By October 1974, plaintiff and defendant had together solved all but two of the EMI problems. These related to intermodulation and conducted emission (low frequency noise). On December 6,1974, a Major Gar-wick prepared an office memorandum which stated:
With the exception of the initial problems, the radios encountered at NESTED [the Government’s test facility] I think we will find the radios satisfactory, with problems in EMI which will require waivers. [Emphasis supplied].
Plaintiff claimed that the conducted emission problem would take months to solve, and it did in fact remain unsolved until March of 1975.
Defendant finally agreed to receive the defective first articles for testing but only for the purpose of assessing the seriousness of the EMI deficiencies.[37] Although it had *1350 found six deficiencies in the first article radio set, defendant conditionally approved the first articles in April 1975. Its approval was, however, subject to plaintiff’s correcting the radio sets to comply fully with all specification requirements. Plaintiff thus was authorized to start production, but it was not given any waiver of any contractual requirement.[38] Micropac did not receive authorization to begin production until May 1975, 15 months later than originally scheduled.

Defendant's Investigation of the Drawing Deficiencies

Meanwhile, defendant continued to investigate the drawing deficiencies which plaintiff had compiled. It referred the purported errors to the Collins Canada Division of Rockwell International of Canada Limited, and to the Electronic Systems Division of Tracor, Inc. (“Tracor”), for analysis. Senior engineers of each company independently reviewed the compiled drawing deficiencies. It is noteworthy that they took almost as long to analyze the errors as plaintiff had set aside to find and correct them.
Tracor’s study concluded that the drawing deficiencies had caused far less damage to plaintiff than was claimed. Tracor looked at the time distribution of plaintiff’s engineering change activity,[39] and it concluded that plaintiff must have known at the start of the contract that it would be difficult to manufacture complex electronic equipment from another company’s drawings. In Tracor’s opinion, the low scrap and rework level, showed that plaintiff had avoided most of those difficulties.[40] It believed that plaintiff had obtained many complete drawing revisions from outside sources with little effort, and that it had created only a small number of drawings for this contract.[41] It also felt that the Government-furnished data package contained a lower percentage of drawings with errors than would normally be expected in a limited production drawing package.[42] It said that the total cost to plaintiff of the changes was approximately $133,000, and that this figure was approximately twice the expense that was necessary.[43]
*1351 Collins’ assessment was even less favorable to plaintiff. Collins stated that plaintiff’s claims were:
[Generally speculative and represent a gross exaggeration of the situation by implying that dire consequences would have resulted had Teledyne failed to correct the documentation errors.
Of the 236 changes at issue, Collins felt that only 99 were “valid.”[44] Collins did not consider any of the “valid” changes to be “major.” It classified 42 errors as “minor,” and the remaining 57 as “trivial.”[45]
Collins concluded that, in the hands of experienced personnel, all the “valid” problems would have formed a “normal part of the day to day effort required during the course of manufacture of equipment of this complexity.” It added that “[t]his level of effort would certainly be included in the estimated cost of building the equipment, and in no way constitutes an extraordinary situation.”
Plaintiff’s claim for an equitable price adjustment for correcting the deficient drawings was denied by the Government’s contracting officer on June 4 and was timely appealed on June 25, 1975.[46]
The EMI “Waivers”
Although the problems encountered with the Government-furnished drawings and model are closely interrelated, they are separately treated in the Board’s opinion, requiring similar treatment in this recitation of the facts.
The foregoing section therefore relates primarily to problems in upgrading the drawings. Design and production problems relating to the EMI requirements remained to be solved. After further effort, plaintiff was able to explain or to eliminate all but two of the EMI design problems. These involved decibel readings somewhat lower than those permitted by the contract specifications. As stated earlier, the Government-furnished model had suffered from the same deficiencies.
By September 1975, plaintiff had spent a year attempting to overcome the various EMI difficulties. It finally made a formal request that defendant either amend the contract specifications, or grant a waiver with respect to the two remaining problems. Plaintiff pointed out that the previous specifications under which Collins had produced the radio set had been relaxed in closely related circumstances.[47] Defendant *1352 replied that it would have to test the radio set with plaintiffs proposed specification changes before reaching a decision. Two months later, in November 1975, defendant had completed testing and recommended acceptance of the radio set with the waiver plaintiff had proposed. However, rather than granting the waivers outright, as it had under the Collins contract, defendant sought plaintiff’s release of defendant from its claim for costs already incurred and pending before the ASBCA, as “consideration” for the requested “waivers.” Plaintiff refused.
Finally, in February 1976, the parties executed contract modification P00006 pursuant to which defendant granted the plaintiff the requested specification “waivers” and as “consideration” therefor plaintiff agreed to perform without charge some new unrelated work, namely, redesign of the frequency synthesizer of the radio set for the Government’s future use. The Board opinion states that this unrelated work which plaintiff undertook to perform cost $100,000 to $150,000 and took 6 months to perform. At plaintiff’s insistence the following statement was included in the contract modification:
This modification shall not be construed in any manner whatsoever as altering the appeal of Teledyne Lewisburg under this contract known as ASBCA No. 20491.
The parties agreed that the additional work on the frequency synthesizer was to be considered full and complete compensation for the “waivers." As do all contract amendments, the modification provided that “[e]xcept as modified herein all terms and conditions of the contract remain unchanged.” The agreement made no mention whatsoever of the costs plaintiff had previously incurred in attempting to cure the EMI difficulties prior to waiver. Plaintiff sought an equitable adjustment for those costs in a May 11, 1976 amendment to its complaint in ASBCA Docket No. 20491.
In November 1976, pursuant to a delivery schedule extension, plaintiff timely delivered the total contract quantity of 639 radio sets.
Summary Analysis of the ASBCA Opinion[48]
As previously noted, the ASBCA chose to divide the case into three discrete issues although they are on these facts closely interrelated. The first issue involved plaintiff’s claim that it was entitled to an equitable adjustment because of the extensive drawing review and revisions it had been compelled to perform. The second focused on the “wheelspinning” expenses[49] plaintiff incurred while attempting to resolve the EMI problems which were eventually waived. The third centered on a claim plaintiff had made on behalf of its subcontractor Micropac for delay costs incurred while plaintiff and defendant were trying to resolve the first two issues above described.[50] For convenience, the Board referred to these as the “drawing review,” the “EMI,” and the “Micropac” claims, respectively.
The “drawing review” claim was rejected on three grounds. First, said the Board, plaintiff had failed to show by a preponderance of the evidence that the Government-furnished drawing package was inadequate for production purposes. Second, the Board held that plaintiff was a victim of its assumption of the “performance” risks inherent in the drawing package. Finally, the Board ruled that the disclaimer quoted in note 27, supra,[51] released defendants from any liability that might otherwise have resulted from the furnishing of defective drawings.
The Board also rejected defendant’s “EMI” claim. As it had done in the case of the “drawing review” claim, the Board held *1353 that plaintiffs assumption of risk and defendant’s disclaimer of responsibility barred recovery. In addition, said the Board, the “EMI” claim was the subject of an accord and satisfaction. In reaching this latter conclusion, the Board relied on contract modification P00006 earlier described in which the two remaining EMI problems were waived in exchange for performance of unrelated new work. In the Board’s view, the modification not only waived the remaining EMI difficulties, but also relieved defendant of any liability for plaintiff’s previously incurred expenses in attempting to meet the EMI requirements. The Board further held that defendant had been timely in granting the waivers and had not delayed plaintiff by previously withholding the waivers.
The ASBCA also denied the “Micropac” claim. It held that the subcontractor’s costs claim derived from the other two claims and since it concluded defendant was not at fault with respect to those claims, it was similarly free of liability on the “Micropac” claim.

Plaintiff’s Challenge of the ASBCA Opinion

As to the “drawing review” claim, plaintiff asserts that defendant had represented that the Government-furnished drawings and model radio[52] sets represented substantially the same item and therefore plaintiff should not have been expected to bear the substantial costs and delays incurred to make the drawings conform to the model sets. It further contends that although it assumed some risks under the contract provisions, it did not assume the risk of being furnished an “outdated” drawing package.[53] Plaintiff therefore challenges the Board’s holding that the “disclaimer” provisions effectively relieved defendant of liability for furnishing a drawing package that was “outdated” and which therefore contained so many errors and variances when compared with the model. Finally, plaintiff argues that defendant breached its warranty that the Government-furnished property would serve its intended purpose, namely, to assure that plaintiff’s radio sets would achieve “maximum identicality” with the model sets, and therefore with the radio sets already in inventory and in use.
For the same or similar reasons plaintiff also challenges the Board’s opinion charging plaintiff with assumption of risk justifying defendant’s rejection of the “EMI” claim. It further disputes the Board’s holding that plaintiff surrendered its “EMI” claim in an “accord and satisfaction,” and points out that the modification granting waivers in consideration for unrelated new work was not a release of or accord regarding the EMI claim for costs already incurred, and that it had refused to release that claim and had specifically reserved its rights in the modification.
Finally, plaintiff argues that it is entitled on the same grounds to recover on behalf of Micropac for the losses its subcontractor has incurred.
OPINION
As stated at the outset, this case involves review of a decision of a contract appeals board under standards set forth in the “Disputes” clause contained in the contract.[54] The wording of the clause is mandated by statute.[55]
*1354 Both in its brief and at oral argument afforded on January 26, 1982, plaintiff makes the threshold argument that the Board decision in this case requires closer scrutiny and is entitled to less deference because the Board member who issued the decision was not assigned to the case until “after the closing of the Administrative Record and did not preside at nor participate in the proceedings before the Board.” Plaintiff further observes that this is an unusually voluminous record, consisting of 364 pre-hearing exhibits plus additional exhibits offered at the hearing, which lasted 19 days over a period of 5 weeks, generating 2,636 pages of transcript, and four briefs totalling 575 pages. After the record had been closed and had been under consideration by the hearing member for 13 months, the case was reassigned to another Board member who then wrote the decision “in the scant period of approximately four weeks.” [Emphasis in original].
Plaintiff points out that the author of the opinion was therefore in no special position to judge credibility[56] since he did not observe any of the witnesses. It is argued that plaintiff is entitled to have the “entire ” [emphasis in original] record reviewed by the trier of the facts and that anything less would be a denial of due process.. In plaintiff’s opinion, it “strains credulity” to believe that the author of this opinion “could have reviewed the entire administrative record (or was even physically able to do so) with the detail required to grasp all of the factual and legal issues in the case and to render a reasoned and accurate decision based on all of the evidence presented.”
Whether or not plaintiff’s argument has merit, this threshold issue is academic for the following reasons. The “Statement of Facts” above set forth relies almost entirely upon the ASBCA’s findings of fact.[57] Where a relevant and material finding of fact has, on an examination and “close scrutiny” of the “entire” record been found to be unsupported by substantial evidence (or by any evidence), that circumstance has been duly noted in the “Statement of Facts” prepared for this opinion.[58] Moreover, it is only the Board’s findings of fact which are entitled to finality, under the standards specified in the quoted statute and contract provision.[59] The analysis and legal conclusions drawn by the Board from those facts are not entitled to finality. Since an examination of the Board’s opinion and decision demonstrates that it hinges essentially upon conclusions of law, namely, an interpretation of the contract provisions relating to the Government-furnished property, the representations express or implied with respect to the use and purpose of that *1355 property, and the disclaimer language hedging those representations to some extent, the decision is not entitled to any presumption of finality serving to inhibit a full review by the court.
This type of litigation in cases involving very similar facts occurs with unfortunate frequency.[60] It occurs all too frequently because the Government as in this case furnishes information and property to prospective bidders based upon a sound procurement policy which contemplates lower bids and earlier completion than could otherwise be expected if each of a multiplicity of prospective bidders were expected to ferret out that same information and property for itself. In this particular case, an additional and even more important procurement policy supported the furnishing of the drawings and model to prospective bidders, namely, an understandable desire to achieve maximum identicality with radio sets of the same nomenclature already in inventory or in the field which the Marines were required to logistically support. But then those two sound procurement policies and purposes are nullified in some indeterminate degree by disclaimers that the Government-furnished information and equipment is to be relied upon.
When controversy and litigation understandably result, the courts and boards have in most cases carefully balanced the “representation” language against the “disclaimer” language in order to achieve a result appropriate to each particular case. The Board opinion here under review is unique in that it focuses exclusively upon the “disclaimer” language, and virtually ignores the “representations” with respect to the use and purpose of the Government-furnished property, other than to recite those representations in its statement of the facts.
Recapitulating those facts, the Request for Proposals, while specifically noting deficiencies in the “thin film hybrid circuits” (as to which there is no issue) emphasizes the need to maintain identicality “to reduce the impact of changes on Marine Corps Logistics and training requirements.” Equipment was to be produced which was “to the maximum extent in accordance with the [Government-furnished] drawings * * [61] Prospective bidders were to identify drawings not compatible with the specification so that the Government could determine whether changes to the specification were appropriate.[62]
Referring specifically to the Government-furnished drawings and model, the RFP emphasized that they were provided to assure “maximum identicality with the model,” and that the Government-furnished drawings and model were accepted by the Government pursuant to the contract under which they were procured,[63] a contract which was identical in all relevant respects to this contract.[64] But prospective bidders were not made aware of the fact that the model produced under that prior contract had failed to meet its specifications in certain material respects and that the specifications had therefore been waived.[65]
*1356 Moreover, the disclaimer language on which the Board opinion rests was not directed to the possibility that the 1971 drawings corresponding to this Government-furnished model would be overlooked, and that an outdated drawing package would be furnished instead. It speaks rather of the drawings not meeting the contract requirements “in every respect,”[66] and disclaims that the drawings were “complete and accurate and free from omissions, errors, inconsistencies or other defects,” the type of errors and deficiencies which plaintiff had anticipated and had listed prior to award, and which it reasonably expected to rectify within a period of about 5 weeks. This interpretation was confirmed by the Government attorney who had drafted the disclaimer language, and who testified that it was intended to cover “minor errors, draftsmanship difficulties, situations where suppliers went out of existence * * *.”[67]
Moreover, the Board opinion appears to treat the problems with the Government-furnished drawings, and the problems with the Government-furnished model as unrelated whereas, on the contrary, they are always spoken of in the conjunctive and together were furnished as the means of obtaining “maximum identicality” with the model.[68] Although prospective bidders were not afforded an opportunity to examine the model in detail nor to break it down, the Board opinion observes that plaintiff undertook to perform the contract without adequately comparing the model with the drawings. This was, of course, impossible prior to award.[69]
In its proposal, plaintiff undertook after award to evaluate the Government-furnished model against the drawings and specifications and to resolve conflicts between the specifications and Government-furnished model in order to achieve maximum identicality with the model and to achieve “maximum compliance with the Marine Corps package.”[70] This procedure was based on the assumption that it was receiving the 1971 drawing package pursuant to which the corresponding model had been produced. Plaintiff also specifically noted that the:
assumption is made that the GFP is built correctly and also that it represents all like nomenclatured equipment that the Government must logistically support.![71]!
Furthermore, and consistent with the foregoing, plaintiff submitted a contractually required control plan in which it proposed to construct a piece of equipment identical to the Government-furnished model. The Government approved that control plan without reservation.[72] In its opinion the Board recites these understandings as plaintiff’s assumptions,[73] without evaluating the reasonableness of those assumptions in light of the contract documents.
When the “Government-Furnished Property” clause was inserted in the contract as finally executed, it reiterated that the described drawings and model “were accepted by' the Government pursuant to the contracts) under which they were procured * * * ” and it further reiterated that they were provided “for the purpose of achieving maximum identicality with the model * * *.”[74] The EMI problems encountered *1357 by plaintiff were similar to those which had been encountered by Collins in producing the model. It was soon apparent to Government officials that waivers would have to be granted in this case as they had been granted to Collins. But the resistant EMI problems were not waived for a long period of time thereafter while plaintiff continued to “spin its wheels” trying to achieve maximum identicality with a model suffering from similar problems which had (without plaintiffs knowledge) been waived in the case of the model.[75]
The court cannot be oblivious to the various representations summarized above nor to the purpose for which they were intended, nor to the appropriate inferences to be drawn therefrom. In a similar context wherein it was sought to downgrade the role of a resident engineer on a construction site, it was once observed that it “would be inane indeed to suppose that [he] was at the site for no purpose.”[76] It would be equally inane to suppose that the representations in this case were made and the Government information and equipment in this case were furnished “for no purpose.”[77]
Other Board decisions have arisen out of similar factual contexts, but have adopted a more balanced approach. Viewlex, Inc.[78] involved procurement of a quantity of signal generators. There, as here, the Government provided microfilm of manufacturing drawings and a model of a signal generator for comparison and for use in meeting the interchangeability requirements of the contract. The contractor claimed that the Government-furnished microfilm of drawings was in part incomplete and illegible and that the Government had superior knowledge of those facts, even though the contractor had been afforded a pre-contract opportunity to examine the microfilm. As in this case, the Viewlex contract required that the signal generators to be produced “be physically, mechanically and electrically interchangeable with the corresponding components and parts of the Government-furnished * * * signal generators."[79] As in this case, the Government-furnished property clause in Viewlex stated that the:
Government furnished items were accepted by the Government pursuant to the contract(s) under which they were originally procured, and delivered to, the Government, but the specifications and other requirements of said contract(s) may not be identical to the requirements of this contract. * * * The Government does not represent that the Government furnished * * * signal generator meets the requirements of this contract in every respect nor does it represent that the microfilm of manufacturing drawings is complete or legible in whole or in particular part or that the drawings from which the microfilm was made are complete and accurate and free from omission, errors, inconsistencies or other defects * * *.[80] [Original in capitals]
It was the Government’s contention that its microfilm drawings were furnished for “no contractual purpose.” Reading the contract as a whole, the ASBCA held in View *1358 lex that the appellant was entitled to recover.[81]
The described Board decisions follow decisions of this court. It is rare that we are afforded the luxury of a precedent as close on its facts as Thompson Ramo Wooldridge Inc.[82] It was a case which also involved a radio transmitter which was required to be physically, mechanically and electrically interchangeable with a Government-furnished model. Here also, the Government furnished “Microfilm of Manufacturing Drawings.” A large number of the prints turned out to be of poor quality and could not be used. The model was disassembled and the needed drawing details were obtained by “reverse engineering” the model. Here, also, there was disclaimer language purporting to nullify the representations expressed or implicit in the Government-furnished property clause.[83] Here, also, the Government-Furnished Property clause[84] stated that the items furnished “were accepted by the Government pursuant to the contracts) under which they were procured * * that they were—
furnished for such information and assistance as they may provide the Contractor * * * in meeting the requirements of this contract with respect to interchangeability * * *. The Government does not represent that the Government-furnished * * * Radio Transmitter meets the requirements of this contract in every respect, nor does it represent that the microfilm is legible in whole or in any particular part * * * and it does not represent that equipments * * * made in accordance with the Government-Furnished * * * Radio Transmitter * * * and/or Microfilm of Manufacturing Drawings will meet the performance or other requirements of this contract including the specifications referenced directly or indirectly herein.
The court held, construing the same disclaimer language which we have in this case, that the disclaimer did not vitiate the representations regarding the purpose for which the drawings and model were being furnished.[85] The opinion states, inter alia:
But since the general * * * warranty was not wiped out, the plaintiff had the right to expect microfilm which was substantially complete, accurate, and legible in most respects, and which would enable it reasonably to produce radio transmitters in accordance with the contract’s terms.
*1359 Lastly, we hold that Thompson Ramo’s pre-bid examination of the microfilm did not render the contract warranty inoperative (through waiver or estoppel) or prevent the plaintiff from invoking it as a basis of recovery. It has not been proven, in the first place, that this examination provided actual knowledge of the microfilm’s inferior capacity for making prints.[86]
******
We indicated at the outset that the contract required Thompson Ramo to manufacturer the radio transmitters so that the “components and parts of the equipment and maintenance parts shall be physically, mechanically and electrically interchangeable” with the prototype radio transmitter.
******
In this contract, interchangeability was an important element, and plaintiff had every right to expect that the film would help it in that aspect of production.![87]!
In reaching this result, the court relied on a time-honored rule of the United States
Supreme Court:
If the Government wished to leave the matter open to the independent investigation of the claimants it might easily have omitted the specification * * *.[88]
Defendant’s reliance on Rixon Electronics, Inc. v. United States,[89] is misplaced. The claim in that case was the subject of a clear and unequivocal release, and plaintiff failed to show that the release had been signed under “economic duress.”[90] Moreover, the contract documents contained many more warnings and disclaimers than in this case, and the warnings were unequivocal. In addition, and as stated by the court: “a clause used in other contracts that the microfilms would also be useful in obtaining interchangeability, was conspicuously missing here.”[91] The model in Rixon had been obtained under different specifications,[92] whereas the model in this case was built under identical relevant specifications.[93] In Rixon, the deficiencies in the microfilm of drawings could have been determined from a pre-award examination. In our case, the fact that an outdated drawing package had been furnished could not be determined until after award, when parts were being ordered from the supplier (Collins) which had prepared the drawings.[94]
In summary, this case is not only clearly distinguishable from Rixon, but it presents facts even more supportive of recovery than those relied upon in Thompson Ramo Wooldridge, supra.[95] In this case, the “disclaimer” language can be accorded full force and effect, without detracting in any degree from the right of plaintiff to rely upon the *1360 Government-furnished drawings and model in order to achieve maximum identicality with the model, as the contract represented and required. That is because the disclaimer language is not directed to and does not correspond to the difficulties which plaintiff encountered and for which it seeks redress herein. Its difficulties were with outdated drawings, because defendant’s representatives had overlooked the later drawings corresponding to the model; and its further difficulties arose out of not being informed that the model, presumably built to identical specifications, had been accepted following waiver of those specifications. These difficulties were further caused by the fact that plaintiff submitted a control plan to build radio sets identical to the Government-furnished model, and the plan was then approved by the Government without reservation. Had plaintiff strayed from that plan, it would not have met the important interchangeability requirements of the contract. None of the disclaimer language is addressed to the above-described difficulties. The disclaimer language is addressed, rather, to difficulties which plaintiff anticipated and for which it makes no claim. The reasoning of the Board decision depends almost entirely on an “assumption of risk” theory. Plaintiff cannot be expected to assume risks that it could not and did not know about, until it was too late.
Under a proper interpretation of these contract provisions, plaintiff acted reasonably in undertaking a complete review of the drawing package by comparing it with a disassembled model, following discovery that it had been furnished the 1970 drawing package rather than the 1971 drawing package corresponding to the model.[96] Plaintiff is entitled to recover the costs, including delay costs, of this review. There should be deducted from those costs all expenses associated with correcting the type of errors contemplated by the contract documents and reasonably to be anticipated by plaintiff.
Plaintiff is also entitled to recover its costs in trying unsuccessfully to eliminate the EMI difficulties which persisted despite conformance to a control plan (approved by the Government) which contemplated duplication of the Government-furnished model previously accepted by the Government under identical EMI specifications. The period during which such costs are recoverable should be measured by the date when Government representatives first became aware that waivers (as had been granted under the Collins contract) would also be required here, and the date when those waivers were finally granted.
Because it denied all liability, the Board did not treat the issue of damages in its findings and opinion. We are not privileged to do so now but must remand to the Board for settlement or for findings and opinion on that quantum issue.[97]
In the case of the EMI difficulties, the Board offered an alternative legal ground for denying this part of the claim, namely, that it had been the subject of an accord and satisfaction.[98] That conclusion of law is without merit. There is literally no evidence in the record supporting a determination that this aspect of the claim was released or that the parties in any way demonstrated an intent that it be released. The *1361 evidence is in fact to the contrary.[99] When defendant finally granted the necessary waivers, it sought a release of the claim for EMI costs already incurred, and was refused. Thereafter, when the modification in which the waivers were granted was finally issued, it recited as consideration for the waivers not a release of EMI costs already incurred, but rather the plaintiff’s promise to perform entirely new unrelated work which the Board found to cost an additional $100,000 to $150,000, and which it found took 6 months to perform. The modification specifically stated, at plaintiff’s insistence, that it in no way altered the pending appeal. Although the EMI costs had not yet been formalized and incorporated in the pending appeal, both those costs and the costs attributable to defective drawings were closely interrelated and were so regarded by plaintiff. The drawings and model were spoken of in the conjunctive throughout the contract documents.[100]
Moreover, there would have been no need to even mention the pending appeal in a modification devoted solely to EMI difficulties if the EMI difficulties were regarded as being separate and unrelated to the pending appeal. The EMI problems were in fact a closely-related extension of the drawing problems cited in the pending appeal, and EMI costs were added to the appeal as soon as they had been determined. The mere failure to mention the EMI costs already incurred does not mean that they were thereby released. If that were so, anything as to which the modification was silent would be deemed to have been released because it was not mentioned in the modification.
The accord and satisfaction or release issue is raised for the first time in the Board opinion. It was not mentioned in the pleadings before the Board, and it appears for the first time in post-hearing briefs. Finally, the modification relied upon as an accord or release in this case bears no resemblance whatever to the clearly worded release supporting the decision in Rixon.[101]
CONCLUSION
Plaintiff’s motion for summary judgment is granted, defendant’s cross-motion is denied and the case is remanded to the Armed Services Board of Contract Appeals pursuant to Rule 149 for a determination, consistent with the foregoing, on the remaining issue of quantum.[102] Proceedings herein are stayed for a period not exceeding 6 months. Counsel for plaintiff is asked to provide periodic advice as to the status of the proceedings on remand pursuant to Rule 149(f). Attention of counsel and the Board is also directed to Rule 150.

 Pursuant to order of this court dated October 4, 1982, Judge Spector, on October 8, 1982, entered a final judgment in accordance with his recommended decision of June 30, 1982. We treat appellant’s exceptions to that decision as an appeal from the final judgment.

. 41 U.S.C. §§ 321, 322 (1976). Jurisdiction in contract cases is conferred upon the court in the Tucker Act, 28 U.S.C. § 1491 (1979 Supp.)

. This recitation of the facts relies almost entirely upon the ASBCA’s findings of fact which under the Wunderlich Act (note 1, supra) are to be regarded as final and conclusive unless fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In certain instances, additional facts which are fully supported by the record but not mentioned in the Board opinion, have been included for clarification. See Sherwin v. United States, 193 Ct.Cl. 962, 979, 436 F.2d 992, 1002 (1971); Ray D. Bolander Co., Inc. v. United States, 186 Ct.Cl. 398, 409 n. 11 (1968); Maxwell Dynamometer Co. v. United States, 181 Ct.Cl. 607, 631, 386 F.2d 855, 870 (1967).

. The Canadian Commercial Corporation had previously developed the set under a United States Air Force contract awarded in 1964, but it had apparently not manufactured any sets before the award of the first production contract in October 1968.

. Various Collins affiliates or subsidiaries are mentioned later in this opinion. For the sake of convenience, they too are generally referred to simply as “Collins.”

. “Identical” or “identicality” in this context means interchangeability of form, fit, and function to the lowest piece part level.

. The drawings were so labeled because they satisfied the requirements of specification MIL-D-1000, Categories E and F, Form 2. They were also expected to meet microfilm requirements attached to the contract.

. Unless otherwise indicated, the underlined portions of all quotations in this opinion reflect emphasis contained in the original.

. These were the drawings Collins had developed in connection with its production of radio sets under the 1968 Marine Corps contract as earlier described.

. The relevant portion of this requirement reads as follows:
“Any exceptions or deviations taken to either the specification or drawings shall be explained in the proposal. The explanation should provide the detail necessary for determining whether changes to specification are appropriate, and the extent to which the drawings are not compatible with the specification. If no exception or deviation is taken, the bidder should so state.”

. Bidders were required to describe how they would locate a source of supply for thin film hybrid circuits or, if the circuits were to be produced in-house, how they would be designed, manufactured, and tested. Furthermore, they were to provide details of a specific design change in the radio set’s microphone. Finally, bidders were required to describe how they would meet specifications governing interchangeability.

. The applicable provision reads as follows:
“Deficiencies — Where applicable deficient areas of the drawing package and specification, if any, should be listed. If no deficient areas exist or are uncovered during the offeror’s investigation, such shall be stated in the proposal.”

. Section F added to the RFP the following new paragraph 3.2.4 on interchangeability:
“The units and parts of the equipment shall be physically, mechanically and electrically interchangeable and shall have equivalent mechanically [sic] and electrical properties with corresponding unit and parts of Radio Set AN/PRC-75 as detailed on Government furnished engineering drawings, l.D. No. 06828, and contained in the Government furnished model, except for those changes required to implement dynamic microphone input. For the purposes of this specification, individual thin film hybrid circuits shall be considered as a piece part.” [Emphasis supplied]

. This appears in the following new subparagraph 3.2.4.1:
“In the event of any conflict or inconsistency between the performance or other requirements specified herein, and the requirements respecting interchangeability, the performance requirements specified herein shall govern. It shall be the responsibility of the contractor to *1342 determine whether any such conflict or inconsistency exists and the Contractor shall immediately, upon discovery of any such conflict or inconsistency, notify the contracting officer thereof, giving full details.” [Emphasis supplied].

. The disclaimer reads as follows:
“INFORMATION REGARDING GOVERNMENT-FURNISHED PROPERTY AND DATA
“The following Government furnished items were accepted by the Government pursuant to the contract(s) under which they were originally procured by and delivered to, the Government (emphasis supplied), but the specifications and other requirements of said contract(s) may not be identical to the requirements of this contract; and the Government does not represent that the Government Furnished Radio Set, AN/PRC-75, and Manufacturing Drawings ID. No. 06828 meet the requirements of this contract in every respect, nor does it represent that the Manufacturing drawings are complete or legible in whole or in any particular part are complete and accurate and free from omissions, errors, inconsistencies or other defects and it does not represent that the equipments or repair parts made in accordance with the Government Furnished Radio Set AN/PRC-75 and Manufacturing Drawings, I.D. 06828 will meet the performance or other requirements of this contract including the specifications referenced directly or indirectly herein.

“In Step One of this Two-Step 1FB, the model and microfilm of the Manufacturing Drawings are made available to all offerors in order for them to determine and set forth in their technical proposals the deficient areas therein. Therefore, the model and Manufacturing Drawings are provided to the Contractor for the purpose of achieving the maximum identicality with the model consistent with meeting the specifications subject to the deficiencies listed in the technical proposal as it may have been amended and accepted."

. Plaintiff contends that it made this assumption because of the provision in the RFP that the radio set’s units and parts would have to be interchangeable with those “detailed on the Government furnished engineering drawings * * * and contained in the Government furnished model” of the radio set. [Emphasis supplied]. See note 12, supra It also points to the following language in the RFP:
“[T]he model and Manufacturing Drawings are provided to the Contractor for the purpose of achieving the maximum identicality with the model * * See note 14, supra. Plaintiff emphasizes that the linking of the model set *1343 and the drawings in this way signaled that the drawings pertained to and represented the model.

. The Board states “[t]he appellant knew that Collins had failed to meet fully the specifications and had received waivers from some requirements.” This finding is not supported by substantial evidence or any evidence in the record. There is no evidence that plaintiff knew the Collins’ radio set had failed to fully meet the specifications under which it was produced. Furthermore, portions of the record cited by the Board show only that defendant had waived Collins’ obligation to submit “first articles” under the contract. If anything, this buttresses plaintiffs view that, since defendant was apparently satisfied with the Collins’ sets, plaintiff acted reasonably in presuming that the Collins’ sets had been properly designed and manufactured (particularly with respect to EMI requirements) and that it could go directly into production. This important issue is discussed later in the opinion.

. Plaintiff’s account of this meeting differs from the version set forth in the Board opinion. Plaintiff points to testimony confirming defendant’s belief that the foremost source of inadequacy in the drawing package was the lack of schematic drawings for the hybrid micro-circuits, as above-stated. It contends that defendant made similar representations to plaintiff at an April 28, 1972 meeting which is not mentioned in the Board’s opinion. Minutes of that meeting support plaintiff’s contention that the drawing pertaining to the hybrid micro-circuits were emphasized as the ones most likely to be inadequate. If such representations were made, they would lend credence to plaintiffs belief that the remainder of the Government-furnished drawings were in substantially useable condition.

. Plaintiffs comments at that time were as follows:

“Drawing Deficiencies

“The drawing package (Marine Corps Supply Activity I.D. No. 06828), is not adequate for the purpose of building the radio set due to numerous deficiencies.
“The deficiencies may be broadly classified in two categories:
“(1) drawings which do not present adequate definition of the part, assembly, etc., that they represent.
“(2) drawings which contain errors that preclude compatibility within the drawing or with a higher assembly.
“The discrepancies uncovered so far represent only immediately obvious errors/omissions. A complete detailed review must yet be accomplished to uncover less apparent deficiencies such as tolerance build-up, currency of referenced specifications, etc. In addition, the drawings have not yet been compared with the GFE [Government-furnished equipment] AN/PRC-75.” [Emphasis supplied].
After a 5-page discussion of the errors it had discovered, plaintiff concluded:
“Summary — Teledyne, in its investigation of the drawing package has found numerous instances where errors or conflicting information exists, and the drawing review is not yet complete. Teledyne expects that there are many more discrepancies as yet undiscovered. Many, but not all, of the discovered discrepancies are minor in nature, such as typographical errors for instance, where the intent of the drawings is clear or may be easily determined by reference to other drawings. However, each of these must be strictly interpreted as a drawing deficiency. In those areas where a definite incompatibility exists, MIL-R-82196A and/or an operating government furnished equipment, as appropriate, will be used to resolve the discrepancy under Section 3.1.1, interchangeability. ”
Plaintiff contends that the above comments reflected an expectation that there would be a 4 to 5 percent error rate. Further, plaintiff points out that most of the errors it had discovered at this point involved hybrid micro-circuits, the area where deficiencies were forecast and for which plaintiff already knew that it would have to prepare its own design drawings.

. Plaintiff contends that it intended to sample some of the assemblies and subassemblies or modules and perhaps review one or more modules in detail to verify that the drawings were adequate. It further contends that it considered a more detailed analysis unnecessary' because of the “advanced state of the drawing package Collins had delivered to the Government.” The latter contention presumes that defendant had furnished the most recent Collins drawing package (i.e., the 1971 package) to plaintiff, and that without delivery of the most recent package, plaintiff could not produce an acceptable radio set without undue additional work.

. Magnavox declined the invitation to proceed to the second step.

. The Board’s opinion observes that plaintiff provided this reply even though it had not physically examined an AN/PRC-75 radio set, or compared the set against the drawings. However, it should be noted that although a model set was on display at least once during the period prior to award of the contract, defendant never gave plaintiff an opportunity to examine a model in detail during that period.

. The applicable provision reads:
“The requirements for Data — DD Form 1423, Item A004, requires updating the Manufacturing Drawings to full MIL-D-1000 Category E, Form II Status. This category includes provisions for the Contractor awarded this procurement to furnish Category F drawings where the item was not developed at Government expense. Both of these categories, E and F, require a level of disclosure of design, engineering and quality support information higher than that presently represented by the Government drawings and, more specifically, of the thin film hybrid circuits presently described by source control drawings. Both categories require the inclusion of schematic drawings (among other items) to allow procurement of either identical or interchangeable items from alternate sources. During the contract, the drawing package shall be updated by the Contractor to Category E, Form 2. The term schematic drawing for this procurement is interpreted to mean a drawing of the discrete component equivalent circuit, including component values in the case of passive components, and Electronics Industry Association nomenclature in the case of active components, that is representative of the actual microcircuit being described. This schematic diagram shall be of such technical quality so as to enable a technically qualified micro-circuit manufacturer, together with a source control specification, which all also be provided, said manufacturer could produce a micro-circuit which would meet the requirements for AN/PRC-75 () Radio Set." [Sic]

. This statement may have gone further than some of plaintiffs personnel would have preferred. In describing the April 28, 1972 meeting between plaintiff and defendant, see note 17, supra, one of plaintiffs representatives contended that defendant’s fundamental concern was that it receive schematic drawings of the thin film modules. He continued:
“In further discussion on this particular requirement the Navy stated that all other documents of the PRC-75 drawing package [furnished by Collins under the 1968 Marine Corps contract] were purchased to comply with MILD-1000, Category E, form II. I feel that our response to this particular question should state that our proposal is based on the assumption that those drawings as received do comply and will require no modification by us but that any drawings which we generate will comply with MIL-D-1000, Category E, form II and that no corrections to the remainder of the drawing package are proposed, or whatever the appropriate words might be.”

. Plaintiff called this process a “30-plus-7” review and it was based on the assumption that the drawing package was the latest updated drawing package and that it corresponded to the models which were being furnished.

. It was also far less than the Marine Corps and NAVELEX estimates earlier described. As noted, the other invitee Magnavox, had elected not to participate at all in the second step bidding.

. Micropac had offered to do the required work for about $1,000,000 in contrast to Collins’ offer of about $1,700,000 for the same work acting as the subcontractor to plaintiff.

. In note 14, supra. The applicable contract provision reads in pertinent part as follows:
“GOVERNMENT-FURNISHED PROPERTY: Within thirty (30) days after award of contract, upon Contractor’s written request [to defendant], the Government will furnish the following for use in the performance of this contract:
"Description Stock No. Quantity
Radio Set AN/PRC-75 FSN 5820-454-6032 1 Ea. Manufacturing Drawings 1 Ea.
I.D. No. 06828
Hand Set, H-189/GR FSN 5965-069-8886 1 Ea.
“INFORMATION REGARDING GOVERNMENT-FURNISHED PROPERTY AND DATA The above Government furnished items were accepted by the Government pursuant to the contracts) under which they were originally procured by and delivered to the Government, but the specifications and other requirements of said contract(s) may not be identical to the requirements of this contract; and the Government does not represent that the Government Furnished Radio Set, AN/PRC-75, and Manufacturing Drawings I.D. No. 06828 and Hand Set, H-189/GR meet the requirements of this contract in every respect, and it does not represent that the equipments or repair parts made in accordance with the Government Furnished Radio Set AN/PRC-75, Manufacturing Drawings I.D. 06828 and Hand Set, H-189/GR will meet the performance or other requirements of this contract including the specifications referenced directly or indirectly herein. “In Step One of this Two-Step IFB, the model and microfilm of the Manufacturing Drawings were made available to all offerors in order for them to determine and set forth in their technical proposals the deficient areas therein. The model and Manufacturing Drawings will be provided to the Contractor for the purpose of achieving the maximum identicality with the model consistent with meeting the specifications subject to the deficiencies listed in Contractor’s technical proposal as it may have been amended and accepted.” [Emphasis supplied].
Although this clause speaks of one radio set, defendant subsequently furnished plaintiff with a second AN/PRC-75 radio set, as requested.

. The “Changes” clause reads as follows:
“The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) Drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Where the cost of property made obsolete or excess as a result of a change is included in the Contractor’s claim for adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of such property. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled ‘Disputes.’ However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.”

. The “Disputes” clause reads as follows:
“(a) Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within 30 days from the date of reciept [sic] of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the Secretary. The decision of the Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
“(b) This ‘Disputes’ clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above: Provided, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.”

. In any event, the EMI tests would have consumed approximately 3 weeks, a considerable amount of time under these circumstances. Since the model set had passed all the tests to which plaintiff had subjected it, and since EMI specifications for the Collins contract under which the model had been produced, and this contract, were the same, and since the model had been accepted under its contract, plaintiff reasonably assumed that the model would also pass the EMI tests.

. See note 24, supra.

. See note 4, supra.

. Collins, for example, had quoted to higher revision levels for 50 percent of the 139 parts it quoted the plaintiff. Plaintiff contends that defendant at that time admitted it had responsibility to provide the latest drawing package to plaintiff. The Board either ignored or discounted testimony supporting that contention.

. Plaintiff had provided 100 part numbers for defendant’s review.

. Plaintiffs quotes of portions of the team’s report are incomplete. It quotes that portion of the report stating that “there is an apparent conflict in the NAVELEX contract which requires interchangeability with both the model and the drawings.” The full quotation diminishes somewhat the impact of that statement:
“Because the GFE model contains minor changes, not shown on the Government furnished drawings, there is an apparent conflict in the NAVELEX contract which requires the interchangeability with both the model and the drawings.”
Plaintiff then omits the discussion of the interchangeability of the parts shown on the first drawings, with those of the second. It quotes the first sentence of the team’s final conclusion:
“From the review conducted at Collins it is evident that your Command may be faced with contractual decisions regarding conflict between the Government furnished model and drawing.”
Plaintiff omits the team’s next and final sentence:
“In cases of such conflict it is the desire of the Marine Corps that the specification be the governing factor at all times and that your Command be granted the utmost flexibility in deciding between the model and drawings in keeping with best technical and business practices.”

. Plaintiff deducted 44 drawing changes reflecting an error rate of 5 percent. The remaining 229 drawing corrections formed the basis for plaintiff’s claim for an equitable adjustment under the “Changes” clause quoted in note 28.

. The EMI deficiencies were quite serious. As plaintiff points out, one of defendant’s industrial specialists viewed plaintiffs facilities and reported to the Administrative Contracting Of *1350 ficer on September 30, 1974, that he did “not believe Teledyne can meet current contractual EMI specification requirements and that either waiver or contractual termination actions by the PCO [Procurement Contracting Officer] will be necessary.”
One of defendant’s engineers testified before the Board that at that time he “suspected” that plaintiff could not meet the EMI requirements “[u]nder any circumstances.”

. It will be recalled that the model manufactured by Collins under the identical EMI specifications had also failed the EMI tests and that certain EMI specification requirements had therefore been waived under the Collins contract. See note 16, supra.

. Tracor found that 52 percent of the “engineering change activities” occurred in the first 5 months after award, and that 81 percent occurred before the start of production.

. Tracor found that fewer than 1 percent of the claimed defective drawings resulted in scrap or rework, at an estimated cost of less than $15,000.

. Tracor suggested that plaintiff had redrawn only 24 drawings associated with the claimed defects, and that Collins and another supplier had given it 41 other drawings which, although extensively revised, did not represent new drawings. In addition, Tracor felt that plaintiff had vastly overstated the actual number of its claims. Tracor found that, when it had eliminated common claims (i.e., duplicates and separate claims for the two sides of some artwork), only 122 drawing claims remained. This analysis, however, does not take into account the issue of whether plaintiff was justified in undertaking a total review of the drawings and meanwhile delaying production once it discovered the level of errors in the 1970 drawing package.

. Tracor concluded that the actual error rate was only 8.7 percent, and suggested that this was a reasonable rate.

. Tracor estimated that the one engineer and seven draftsmen plaintiff put to work on the claim effort expended approximately 450 man-days of engineering and 620 man-days of drafting, and that plaintiffs total cost to perform the work totalled less than $133,000. Tracor felt that tbe work could have been done in 60 man-days of engineering and 165 man-days of drafting, for a total cost of less than $50,000. (Recall that the estimated cost of scrap and rework was approximately $15,000, see note 40, supra. Added to the $50,000 in labor costs, this would yield a total estimated cost to plaintiff of about $65,000 in Tracor’s opinion, or less than half the amount plaintiff actually spent.)

. Collins’ impartiality at this point is of course open to question since the drawings it had submitted to the Government under its prior contract were the very drawings under attack. It defined “valid” claims as those identifying actual errors and omissions which had to be resolved before the radio set could be manufactured. “Invalid” claims referred to “unnecessary changes which were made to the documentation” by plaintiff.
"Valid” claims were in turn broken down into three “problem” categories: “major,” “minor,” and “trivial.” “Major” problems occurred when “[a]n error existed which required a major engineering effort to resolve.” “Minor” errors meant, in Collins’ words, that:
“(a) An error existed. However a ready solution was obvious to any qualified engineer or technical person — this type of error would be easily handled by normal day to day collateral engineering support.
“(b) An error existed. However a ready solution was available by reference to the model radio.
“(c) An error existed. However a ready solution was available from a specified parts vendor.”
An error was classified as “trivial” when it was “not essential to production of [the] radio.”

. Clearly there are discrepancies in the number of errors actually at issue. The Board did not reach the issue of amount, and did not resolve the issue regarding the level of errors encountered. It stated:
“The insignificant variations which appear in the testimony and documentary record relating to the number of drawing errors and error percentages expected by the appellant are irreconcilable under the record presented.”

. ASBCA No. 20491.

. The Board opinion speculates that Collins had apparently succeeded in meeting requirements which plaintiff could not, and that plaintiff managed to overcome problems that Collins could not. This speculation is not supported by substantial evidence in the record. Defendant’s tests in fact indicated by its own admission that “the performance of these [plaintiff’s] radios is equivalent to the present inventory of AN/PRC-75 equipment." [Emphasis supplied].

. 79-2 BCA ¶ 14,165.

. See “An Analysis of the Standard ‘Changes Clause’ ”, 25 Fed.Bar J. 177 at 179 (1965).

. It is obvious that costs incurred by plaintiffs subcontractor are part of plaintiffs claim for the difficulties encountered with the Government-furnished drawings and model, and that the subcontractor’s costs must stand or fall as part of plaintiffs claim.

. See also note 14, supra.

. They are treated throughout in the conjunctive.

. This is a reference to the fact that defendant provided the 1970 drawing package to plaintiff, as earlier stated. Had it received the 1971 package, plaintiff feels that it would have been spared all or much of the costly drawing review which resulted. It will be recalled that the Government attorney who drafted the disclaimer language testified that it had not been intended to disclaim responsibility for furnishing outdated drawings.

. Note 29, supra.

. Note 1, supra. 41 U.S.C. § 321 provides:
“§ 321. No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such *1354 official or his said representative or board is alleged: Provided, however, That any such decision shall be final and conclusive unless the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.”
41 U.S.C. § 322 provides:
“§ 322. No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.”
Both the contract and this claim pre-date the Contract Disputes Act of 1978 (41 U.S.C. §§ 601-613) which now permits a trial on the merits in this court as an optional alternative to an appeal to the agency board from a contracting officer’s decision.

. Citing Ordnance Research, Inc. v. United States, 221 Ct.Cl. 641, 660, 609 F.2d 462, 473 (1979). See also footnote at the end of the Board opinion, 79-2 BCA ¶ 14,165 at 69,743.

. See note 2, supra.

. Noteworthy are the comments on the Board’s finding set forth in note 16, supra. As stated in that footnote, there is no evidence to support the Board’s finding that plaintiff “knew that Collins had failed to meet fully the specifications and had received waivers from some requirements.” The portions of the record cited to support that finding are unrelated to and do not support such a finding, nor does any other evidence of record. Also noteworthy but of lesser importance are the comments on the Board findings contained in notes 17, 33 and 47, supra.

. Notes 29 and 55, supra. See also Foster Wheeler Corp. v. United States, 206 Ct.Cl. 533, 513 F.2d 588 (1975); Cosmo Constr. Co. v. United States, 196 Ct.Cl. 463, 451 F.2d 602 (1971); J.B. Williams Co. v. United States, 196 Ct.Cl. 491, 450 F.2d 1379 (1971); Aerodex, Inc. v. United States, 189 Ct.Cl. 344, 417 F.2d 1361 (1969).

. See, e.g., United States v. Atlantic Dredging Co., 253 U.S. 1, 10, 40 S.Ct. 423, 424, 64 L.Ed. 735 (1920); Hollerbach v. United States, 233 U.S. 165, 169, 172, 34 S.Ct. 553, 554, 555, 58 L.Ed. 898 (1914); Whittaker Corp. v. United States, 195 Ct.Cl. 161, 443 F.2d 1373 (1971); Thompson Ramo Wooldridge Inc. v. United States, 175 Ct.Cl. 527, 361 F.2d 222 (1966); Radionics, Inc., ASBCA No. 22727, 81-1 BCA ¶ 15,011; Viewlex, Inc., ASBCA No. 12584, 71—1 BCA ¶ 8692, aff'd on rehearing, 71-2 BCA ¶ 9021. See also Parsons of California, ASBCA No. 20867, 82-1 BCA ¶ 15,659.

. See notes 8 and 12, supra.

. Plaintiff was the only prospective bidder to turn up errors and deficiencies of that type (see text preceding note 18, supra). As a result, plaintiff is charged in the Board opinion with “assuming the risk” of a defective drawing package, while the opinion then goes on to ignore the fact that the claim is predicated not on those types of errors and deficiencies in the drawings but on the additional time and expense of reviewing the drawings once it was discovered that an outdated drawing package, not corresponding to the model, had been furnished by mistake. See notes 18 and 24, supra.

. See note 14, supra.

. See text preceding note 15, supra.

. See note 16, supra.

. Prospective bidders knew they would have to develop their own design and drawings for the microphone and the hybrid micro-circuits. See and cf. the type of drawing problems plaintiff actually encountered after award, as detailed in the text at notes 31-33, supra.

. See text following note 15, supra.

. See note 15, supra, and text following note 16.

. See note 24, supra.

. See note 19, supra.

. Text following note 19, supra.

. See text at note 30, supra.

. See, e.g., 79-2, BCA ¶ 14,165 at 69,731.

. It is undisputed that the specifications of the two contracts were identical (except in certain respects not relevant to this case). Therefore, the disclaimer language in that GFP clause to the effect that “the specification and other requirements of said contract(s) may not be identical to the requirements of this contract,” is not germane. Although the Government knew that the prior contractor had not fully met the *1357 specification requirements of its contract and that they had been waived, plaintiff did not know this. See note 16, supra. See also and cf. Helene Curtis Industries, Inc. v. United States, 160 Ct.Cl. 437, 312 F.2d 774 (1963); Samuel R. Clarke d.b.a. Clarke Enterprises, ASBCA No. 24306, 82-1 BCA ¶ 15,627.

. See text preceding notes 37-38, supra, and the article cited at note 49, supra.

. General Casualty Co. of America v. United States, 130 Ct.Cl. 520, 533, 127 F.Supp. 805, 812-13, cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955). See also and cf. Summit Timber Co. v. United States, 677 F.2d 852 (Ct. Cl.1982).

. See and cf. Chemical Technology, Inc. v. United States, 227 Ct.Cl. 120, 645 F.2d 934 (1981); Womack v. United States, 182 Ct.Cl. 399, 389 F.2d 793 (1968). See also Ziebarth and Alper, ASBCA No. 25040, 82-1 BCA ¶ 15,777, in which the Board recently held: “If the drawings were not intended to be followed, there was no need to include them as part of the contract package.” Id. at 78,134.

. 71-1 BCA ¶ 8692.

. Id. at 40,358.

. Id. at 40,359.

. See also Radionics, Inc., nóte 60, supra, wherein the contract provided that:
“The translator-synthesizer [an item of radio equipment] is being procured to documentation which is unavailable to the Government. The selection of electronic components which have the required characteristics or properties necessary to meet applicable documentation and performance requirements, therefore, is [the] sole responsibility of the contractor and not the Government.”
81-1 BCA at 74,271. As to this the ASBCA found that:
“[Tjhe appellant did not interpret the language of the clause as imposing design responsibility on the contractor and as absolving the Government from responsibility for the adequacy of the drawings (finding 28).
We conclude that the clause was ambiguous in that it failed to clearly evince an intent to exculpate the Government from liability, and that appellant’s interpretation of the clause was reasonable. Consequently, there was no shift of the risk of drawing inadequacies to the appellant. * * * Our conclusion is consistent with the numerous Court and Board decisions
****** which construe exculpatory clause[s] narrowly and restrictively, particularly where as here the Government attempts to avoid a remedy otherwise available under a contract relief clause by means of a disclaimer.” [Citations omitted]. 81-1 BCA at 74,278.

. Note 60, supra.

. There was also an “Order of Precedence” provision which seemed to provide that the disclaimer language would prevail in the event of a conflict with the representation language.

. 175 Ct.Cl. at 534 n. 7, 361 F.2d at 227 n. 7.

. Interestingly, at the Board hearing in Thompson Ramo Wooldridge, a Government witness who supervised the preparation of that contract testified that the disclaimer language was inserted “because 100% perfect microfilm, for the use of anyone else, is an impractical situation.” Compare the similar testimony of the Government attorney in this case. See text following note 15 and note 53, supra.

. Compare this case. Plaintiff had no way of knowing until after award and a comparison of the drawings with the disassembled model, that it had been furnished the outdated 1970 drawing package, and that the 1971 package corresponding to the model had been “overlooked.”

. 175 Ct.Cl. at 539, 541, 543, 544, 361 F.2d at 230, 231, 232, 233. See also and cf. Whittaker Corporation, note 60, supra.

. 175 Ct.Cl. at 542-43, 361 F.2d at 232, quoting from Hollerbach v. United States, 233 U.S. at 172, 34 S.Ct. at 555, note 60, supra. See also United States v. Atlantic Dredging Co., note 60, supra.

. 210 Ct.Cl. 309, 536 F.2d 1345 (1976).

. 210 Ct.Cl. at 313, 323-25, 536 F.2d at 1347-48, 1353-54.

. 210 Ct.Cl. at 316-19, 536 F.2d at 1349-1351. It was not missing in this case. Nor was Rixon furnished a model to achieve interchangeability; nor did it submit a plan to achieve interchangeability by duplicating the model, which was approved by the Government, as in this case.

. 210 Ct.Cl. at 316, 536 F.2d at 1349.

. Specifications which had been waived in material respects without plaintiff’s knowledge.

. It is noteworthy that in Rixon, where the facts clearly failed to support recovery, the court nevertheless stated that “we will not be understood as awarding any laurels to the Government for its procurement policy here displayed.”

. See also and cf. the other cases cited in note 60, supra.

. See text at note 36, supra. The testimony of Collins and Tracor representatives minimizing the amount of time and work involved in that process should be viewed with some skepticism. It was based on hindsight. Both companies took almost as long to review plaintiffs list of defective drawings as plaintiff had taken to develop and prepare the list and correct the errors. See also note 44, supra, suggesting that Collins was less than impartial on this issue. The record shows, in fact, that the Collins’ testimony followed a statement by the Government to Collins that Collins would be deemed liable to the Government if the latter were held liable to plaintiff for furnishing erroneous drawings.

. See United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

. 79-2 BCA at 69,741. A contract modification which is not a release in form or substance is suggested as a release of the EMI portion of the claim.

. See text at note 47, supra.

. The Board decision brushes this fact aside as being of no consequence. See 79-2 BCA at 69,738.

. See note 90, supra. See also and cf. the release issue in Viewlex, note 60, supra, and in Samuel R. Clarke, note 74, supra.

. Although treated as a separate claim in the Board opinion, the claim of Micropac (a subcontractor) is derivative and is properly for review only as part of plaintiffs claim.